William RAYL, Plaintiff,

v.

FORT WAYNE COMMUNITY
SCHOOLS, Defendant.

No. 1:99–CV–35.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Feb. 10, 2000.

Chris K. Starkey, Fort Wayne, IN, for William Rayl, plaintiff.

William L. Sweet, Jr., Wendy W. Davis, Shane C. Mulholland, Beckman, Lawson,

Sandler, Snyder and Federoff, Fort Wayne, IN, for Fort Wayne Community Schools, defendant.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

### I. INTRODUCTION

William Rayl (hereafter "Plaintiff" or "Rayl") has brought this action against Fort Wayne Community Schools (hereafter "Defendant" or "FWCS"), alleging race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (hereafter "Title VII") and age discrimination in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et. seq. (hereafter "ADEA"). Presently before the Court[1] is FWCS's Motion for Summary Judgment filed on October 22, 1999. The Plaintiff filed his response on November 8, 1999 and the Defendant filed a reply on November 22, 1999. The Court then ordered supplemental briefing regarding the applicability of the Seventh Circuit's decisions in *Emmel v. Coca–Cola Bottling Co. of Chicago*, 95 F.3d 627 (7th Cir.1996) and *Cullen v. Olin Corp.*, 195 F.3d 317 (7th Cir.1999), and the Plaintiff and Defendant filed their briefs on December 17, 1999 and December 20, 1999, respectively, and the Defendant filed a supplemental response on January 5, 2000. The Court then noted that the Plaintiff was of the erroneous view that white males could not make out a *prima facie* case under *McDonnell Douglas*, and in order to decide this case on the merits, he was granted an opportunity to file another supplemental brief to support a claim of indirect race and gender discrimination. The Plaintiff filed his supplemental brief on January 24, 2000, and the Defendant filed its supplemental response

on February 2, 2000. This issue is now ripe for review. For the reasons hereinafter provided, FWCS's motion will be GRANTED.

### II. PROCEDURAL AND FACTUAL BACKGROUND

FWCS alleges in its motion for summary judgment that Rayl failed to show direct or indirect racial or gender discrimination under Title VII, and failed to show either direct or indirect age discrimination under the ADEA. However, Rayl contends that racial and gender related remarks regarding FWCS's hiring policy and statistical disparities are sufficient to show direct and indirect discrimination under Title VII. Furthermore, Rayl asserts that remarks related to his age along with statistical disparities are sufficient to show both direct and indirect age discrimination under the ADEA. In order to address these issues at the summary judgment stage, the following factual recitation is drafted in a light most favorable to the Plaintiff.

FWCS hired Rayl, a sixty-year-old male Caucasian, as a bus driver on April 1, 1995. (Rayl dep. at 13, 48). During his tenure as a bus driver, Rayl was formally reprimanded and disciplined, as well as suspended. (Rayl dep. at 49–51, 54–55). While still a bus driver, Rayl applied for four Administrative Aide Positions (hereafter "Aide Position"), which entailed a subjective interview process in which the principal from each specific school, or an internal interviewing committee, made the final decision based on the candidates' experience and qualifications.[2] (Singleton aff. ¶ 5). According to the general job description for an administrative aide, a qualified candidate

[s]hould be a mature person who has had previous experience working with school age students. Should have some college training and be knowledgeable

---

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

2. In his complaint, Rayl also alleged he was discriminatorily denied several other posi-

tions which utilized objective hiring criteria. Rayl now concedes, however, that summary judgment should be granted as to those positions. *See* Resp. at 3.

and understanding of the social and cultural structure of our community. (Def. Deposition Exh. J).

Rayl cited numerous examples of activities to show he is qualified for the positions. For example, to show previous experience working with children, Rayl cited the bus safety program he presented for three years to children in FWCS, both at school and in the community. (Rayl dep. at 16–17). Additionally, Rayl has raised ten children of his own. (Rayl aff. ¶ 5). Rayl also has a four year business degree from St. Francis college, and is approximately half-way through a Masters Degree program in Public Environmental Affairs. (Rayl dep. at 10). In terms of understanding the social and cultural structure of the community, Rayl presents evidence that he has resided in Fort Wayne his entire life, has helped with his sons' Little League team and has volunteered at a local homeless shelter, the Rescue Mission. (Rayl dep. at 15–16, Rayl aff. ¶¶ 6, 8). Despite these qualifications, Rayl was denied each of the four Aide positions. (compl.¶ 7).

FWCS alleges that Rayl was not hired because of his past poor work performance, his lack of qualifications, and because he was not the most qualified individual. (Singleton aff. ¶¶ 6, 8, 9, Reynolds aff. ¶ 3, Schaefer aff. ¶ 3, Br.Sum.Jud. at 19–24; Reply Br. at 9–10). Generally, when filling Aide positions, FWCS looks for applicants that have prior experience within the school in which they are applying, or have some previous experience and background with student activities, disci-

plinary procedures, and conflict resolution techniques. (Singleton aff. ¶ 8, Garner aff. ¶ 2).

For example, the Aide Position at Fairfield Elementary School was filled by Kevin Rogers, an African American male under the age of 40.[3] (Schaefer aff. ¶ 3). This applicant was employed as a school assistant in the Alternative Program at the Anthis Career Center prior to his application, had a wide range of experience dealing with attendance issues, had worked directly with students, staff and parents, and had prior experience working with elementary school children in activities that would be duplicated at the school. (Schaefer aff. ¶ 3).

Rayl also applied for the Aide Position at South Wayne Elementary School, which was filled by Terry Zock, a Caucasian female over the age of 40.[4] (Singleton aff. ¶ 13).[5] This applicant was currently holding a position within the school building, had an exemplary work performance record, extensive leadership and organizational skills, and experience supervising children within the school. (Garner aff. ¶ 3).

The third Aide Position Rayl applied for was at Abbett Elementary School and was filled by Michael L. Edmonds, an African–American male under 40 who had prior extensive experience working directly with students, staff and parents, and in assisting the administrative staff. (Singleton aff. ¶ 14).[6]

The final Aide Position that Rayl applied for was at the Anthis Career Center and

---

**3.** The qualifications for the Aide position at Fairfield Elementary School were as follows: Prefer candidate with a good work and attendance record. Prefer experience working with students, staff and parents. Must be flexible, organized, enthusiastic and energetic while performing several tasks at one time. Must have a positive attitude and training in conflict mediation. (Def. Deposition Exh. K).

**4.** This individual is also referred to as Patrice Zoch in FWCS records.

**5.** South Wayne's Administrative Aid qualifications are as follows: Prefer candidate who has completed some college courses and has a good work and

attendance record. Prefer experience working with students, staff and parents in an administrative capacity. Must be flexible, organized, enthusiastic and energetic while performing several tasks at one time. Must have a positive attitude, excellent communication skills and training in conflict mediation. (Def. Deposition Exh. L).

**6.** The qualifications for the Abbett Elementary School Aide position were as follows: Prefer candidate who has completed some college courses and has a good work and attendance record. Prefer experience working with students, staff and parents. Must be flexible, organized, enthusiastic and able to set priorities. Must have a

was filled by Loretta Clowers, an African–American female, over the age of 40.[7] (Reynolds aff. ¶ 4). This applicant had significant experience with at-risk adolescent children, and exhibited many qualifications and much expertise during her interview. (Reynolds aff. ¶ 5).

When Rayl applied for the Aide Positions, Gayle Harris, (hereafter "Harris"), Rayl's immediate Transportation supervisor, allegedly twice told him that the Aide Positions were reserved for women and African–Americans. (Rayl dep. at 64–70, Rayl aff. ¶¶ 9, 10). Harris further stated that "black children relate better to black adults" and that she did not disagree with

> positive attitude and excellent communication skills.
> (Def. Deposition Exh. M).

7. The qualifications for the Aide at Anthis Career Center included:

> Prefer candidate with a college degree. Prefer experience working with at risk adolescents utilizing positive student management strategies. Must be flexible, organized, enthusiastic and able to set priorities. Must have a positive attitude, excellent oral and written communication skills as well as strong organizational and interpersonal skills. Must have a strong desire to work in an alternative learning environment. Counseling and computer skills helpful.
> (Def. Deposition Exh. O).

8. Rayl's deposition is a bit confusing with regard to the viability of his gender discrimination claim. It clearly states that Harris made gender related remarks, Rayl dep. at 64–68, and suggests that Oyer made such remarks as well, Rayl dep. at 68 ("Q: So we have a statement by Gayle Harris and a statement by Glen Oyer supporting your allegations allegedly that the positions were·reserved for minorities and females? A: Yes"), even though prior questioning regarding Oyer's statements did not include gender related remarks. However, Rayl's deposition also specifically denies that any discriminatory remarks regarding gender were made. Rayl dep. at 19–22, 81 ("Q: ... did [Harris, Oyer, Hester, or Hedges] ever make any comments to you directly about sex or gender? A: No."). For purposes of summary judgment, we will assume that Harris and Oyer did in fact make statements regarding FWCS's alleged hiring policy based on gender, as well as race.

the assessment "that [Rayl was] not hired or given the position because of [his] race and age." (Rayl dep. at dep. 19–22, 64–70, 81–82). Additionally, Glen Oyer (hereafter "Oyer"), a past FWCS transportation manager and bus driver supervisor, and Robert Ennis (hereafter "Ennis"), a retired, former principal at Jefferson Elementary School (Rayl dep. at 67), both confirmed that Aide Positions were reserved for African American applicants.[8] (Rayl dep. at 67–68).

Moreover, Pat Hester, Employment Specialist (hereafter "Hester"), and Bill Hedges, former Director of Personnel (hereafter "Hedges"), also related that the positions were reserved for minorities.[9]

9. Rayl's deposition which we quote at length for purposes of providing context, states the following:

> A: ... I've been told by individuals, uh, Gayle Harris as a, as a matter of fact, uh, Black children relate better to Black adults
>
> ...
>
> ***
>
> A: No, I asked her. I asked her, I said, "Gayle, I heard in the lunchroom," just like I just previously testified, "that all of the administrative aide positions in Fort Wayne Community Schools are filled by Blacks." And she said, "That's correct," and she proceeded to give me an explanation as to what they, what the reason was and she said that, uh, all—or, the Black children we found, she said, "We found that Black children relate better to Black adults." And my response to her was, I, I said, "I don't understand that." and she said, uh, "Yes," she said,·"we've had the—a lot of our problems have come from the Black children not relating to the, these, the individuals that are out there, administrative aides, and they created the position for Blacks." And I told her ...
> Q: She said who created the position for Blacks?
> A: We. The system created....
> Rayl dep. 19–21.
> ***
> Q: You allege that Defendant's agents have told you on many—that many of the positions were reserved for minorities and females?
> A: Yes.
> Q: Tell me each and every fact that supports that Allegation.
> A: The ·statement that Gayle Harris made, the statement that Glen Oyer made.

***

Q: Okay, is there anything else—let's take Gayle Harris—any other statements she has made to you?

A: She made it to me on two (2) occasions.

***

Q: I asked her the question, uh, "Explain to me again" because I didn't understand, I did not understand the, uh, why a certain group could get preferential treatment, and I wanted to verify what I had—what she had told me because I didn't want to go this far.

Q: Verify what she told you back in September and October of '97?

A: Approximately, yes, ma'am.

Q. So your question to her was, "Why did a certain group get preferential treatment?"

A: I said, "Why are—is what we discussed in reference to the eleven (11), eleven (11), uh, administrative aide positions all be Black, is that correct?" And I said, "I don't understand it," and she went on to pr . . . to explain.

Q: Okay, what did she say?

A: She told me again, that, uh, minority children have, uh, they seem to feel that minority children respond better to, uh, to Black authority adults.

Q: Did you report to anybody higher up, like Mr. Yeranko or Mr. Riddley, that she had said something like this to you?

A: I spoke with Mr. Yeranko—or, not Mr. Yeranko but, uh, Glen Oyer. .

Q: Who is Glen Oyer?

A: He was past, uh, Manager North Transportation. I think that's his—was his title.

Q: And then you talked to Glen Oyer right after you talked to Gayle Harris?

A: Sometime.

Q: . . . the second time?

A: Sometime afterwards, yes.

***

Q: Tell me about that conversation [with Glen Oyer].

A: I spoke to him again. I tal . . . told him that I had, had applied for administrative aide positions and had been told, uh, by Gayle and by various other individuals that, uh, those positions are held by—that they were given to Black applicants.

Q: What was Mr. Oyer's response?

A: That was it. That they're given, that they are given to Black applicants.

Q: Did he say anything else besides, "They are given to Black applicants?"

A: Well, he basic . . . basically explained similar to something that, uh, Gayle had said and the others that I spoke with.

Q: Which was?

A: Uh, I think it was Robert Ennis, past retired principal at Jefferson.

Q: What did he say?

A: The same thing.

Q: "Okay, exactly what . . . ?"

A: I asked him the question, I told him, I said, "I have applied for these positions" and I said, "I, I'm getting nowhere." And I said, "Are, are th . . . I've been told that these positions are held primarily, uh, by Black Americans." And he said, "Yes, that is correct."

Q: So he verified that the positions were in fact held by Black people . . .

A: Yes.

Q: . . . but he didn't—did he say that they were only given to Black applicants or Black applicants were only considered?

A: No, he didn't say they were only considered. He said they were given to Black applicants.

Q: So we have a statement by Gayle Harris and a statement by Glen Oyer supporting your allegations allegedly that the positions were reserved for minorities and females?

A: Yes.

Q: Okay, anybody else made a comment to you?

A: Pat Hester.

Q: When was that?

A: I don't remember the exact time. I spoke with her, spoken to her four (4) or five (5) times over the last several years.

Q: What did Pat Hester have to say?

A: She said that was correct. She said they—she . . . .

***

A: I asked [Hester], I told her I've been applying for administrative aide positions and I'm not getting anywhere. And, uh, and she told me that, uh, those positions, she and Bill Hedges, who was a past, uh, Certified Personnel Director for teachers, uh, they both told me the same thing, that, uh, these positions were created because they had, uhm, special rights from the federal government to, to, uh, promote these individuals to balance the . . .

Q: They were given special rights by the government to promote what individuals?

A: Black individuals. Minorities.

***

Q: So you've told me that Gayle Harris, Glen Oyer, Pat Hester, Bill Hedges have all told you that in some form that the administrative aide positions were created for Black people, is that correct?

A: Yes ma'am.

Q: All right. Is there any other person that said anything to you . . .

A: No. Not . . .

Q: . . . that supports your allegations that the positions are reserved for minorities and females?

A: Not, uh, no.

(Rayl dep. at 69, Rayl aff. ¶ 13, Def. Mot.Br. at 4). While neither Harris, Oyer, Hester, nor Hedges were involved in the Aide Position hiring decisions, (Singleton aff. ¶¶ 7, 10, Garner aff. ¶ 4, Reynolds aff. ¶ 6, Schaefer aff. ¶ 4), FWCS admits that at least some were school administrators. (Reply Br. at 4).

Statistically, FWCS had fifty-three (53) Aid Positions as of March 1, 1999. Although men held twenty-four (24) positions and Caucasians held eleven (11) positions, only two (2) positions were held by Caucasian men. Thirty-one (31) of the positions were held by people 40 years old or older.

### III. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff."

Q: Now you've told me about minorities. What supports your allegations that the positions were reserved for females?
A: What supports it? The hiring practice.
Q: Okay, like what?
A: They're filled by females and minorities, 99% of it.
Rayl dep at 64–70.
***
Q: And based on the posting or interview process or anything like that, did anybody ever tell you that any of those positions other than—well, who we've already talked about—were reserved for minorities?
A: No.
Q: Did anybody in the positions that I just talked about ever tell you that those positions were specifically reserved for people under forty (40)?
A: No.
Q: You've told me that all the allegations, or all the comments, made from Gayle Harris, Glen Oyer, Pat Hester, and Bill Hedges had to do with race. Did any of them ever make comments to you directly about sex or gender?
A: No.
Q: What about age?
A: No.
Q: Has anybody at [FWCS] ever made any kind of comment directly to you regarding any of the positions that you applied for regarding your age?
A: Yes, Gayle Harris did.
Q: What did Gayle say?
A: Again, Gayle, uh, Gayle told me during one of the interviews that I had, or the talks that I had with her, that, uh, I would not necess ... and I would quote, "I would not necessarily disagree that you were not hired or given the position because of your race and age" end quote.
Q: So Gayle was the only one then that made a comment about your age?
A: Yes.
Q: Anybody else besides Gayle Harris?
A: I spoke with Pat—yes.
Q: Okay, who else?
A: Pat Hester.
Q: What did Pat say?
Q: Pat told me that, uh, she said, sh ... she said, "You realize you're starting at a late ag[e] ... late time in your life." That's what she said.
Q: But she never told you, "And therefore you will not be able to obtain a position ..."
A: No.
Q: "... because of your age?"
A: No.
Rayl dep at 81–82.

*Id.* at 2512; *North Am. Van Lines, Inc. v. Pinkerton Sec. Sys., Inc.,* 89 F.3d 452, 455 (7th Cir.1996); *In Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the non-moving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.1983), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988). In ruling on a summary judgment motion, the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence nor the credibility of witnesses. *Anderson,* 477 U.S. at 249–51, 106 S.Ct. at 2511; *North Am. Van Lines, Inc.,* 89 F.3d at 455. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Ill. Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed. R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First Nat'l Bank of Cicero v. Lewco Sec. Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

In any event, in employment discrimination matters, the standard on summary judgment is applied with "added rigor." *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993); *see Wohl v. Spectrum Mfg.,* 94 F.3d 353, 355 (7th Cir. 1996). As the Seventh Circuit reiterated in *Robinson v. PPG Industries, Inc.,* 23 F.3d 1159, 1162 (7th Cir.1994), citing the standard set out in *Sarsha:*

> Summary judgment is appropriate only when the materials before the court demonstrate that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues. Accordingly, we will affirm the decision of the district court only if, had the record before that court been the record of a complete trial, the defendant would have been entitled to a directed verdict.[10] [citations omitted].

**10.** The anachronistic term "Directed Verdict" is no longer used; rather, it has been more accurately retitled "Judgment as a Matter of Law." *See* FED.R.CIV.P. 50(a). A defendant is entitled to such a judgment if "there is no

## IV. DISCUSSION

## A. Title VII

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ... [or] sex ..." 42 U.S.C. § 2000e–2(a)(1).

Essentially, on this record, two different frameworks exist through which Rayl may prove that he was discriminated against on the basis of race or gender: the direct, mixed-motives analysis of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), appropriate when both legitimate and illegitimate considerations played a role in an adverse employment decision, and the indirect burden-shifting approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), as re-articulated in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), which is appropriate when either a legitimate or an illegitimate set of considerations led to the challenged decision and the plaintiff offers insufficient direct evidence to preclude summary judgment under the *Price Waterhouse* standard. We will examine each analysis in turn.

### 1. Rayl's "Mixed Motive" Analysis Fails

For a viable claim under the "mixed motives" inquiry as articulated in *Price Waterhouse* and as modified by the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2(m) (hereafter "CRA 1991"), Rayl must present direct evidence that FWCS used race or gender as motivating factors in its decision not to hire him.[11] *Gryczkowski v. Astra USA, Inc.,* No. 97–C–2817, 1999 WL

688533, at *7 (N.D.Ill. March 30, 1999); *Peterkin v. Taco Bell,* No. 3:95–CV–694RM, 1996 WL 939573, at * 4 (N.D.Ind. Nov.20, 1996) (citing *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. 1775). If Rayl satisfies this burden, then FWCS must prove by a preponderance of the evidence that it would have made the same hiring decision absent the discriminatory criteria. 42 U.S.C. § 2000e–2(m); *Peterkin,* 1996 WL 939573, at *4 (citing *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. 1775). However, even if FWCS satisfies this burden, it may still be liable for injunctive relief, attorney's fees and costs for using impermissible discriminatory criteria. *See* 42 U.S.C. § 2000e–5(g)(2)(B); *McNutt v. Board of Trustees of the Univ. of Illinois,* 141 F.3d 706, 708 (7th Cir.1998).

Rayl contends that comments made regarding racial and gender requirements for the Aide Position constitute direct evidence of a policy of discrimination. Direct evidence is that which, "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 724 (7th Cir.1998) (quoting *Randle v. LaSalle Telecomm., Inc.,* 876 F.2d 563, 569 (7th Cir.1989)). "Direct evidence must not only speak to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Randle,* 876 F.2d at 569. Essentially, to show direct evidence, the plaintiff must produce a rare "smoking gun" that the defendant acted with discriminatory animus. *See Troupe v. May Dep't. Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994) (an acknowledgment of discriminatory intent by the defendant may be the only truly direct evidence of intent); *Rush v. McDonald's Corp.,* 966 F.2d 1104,

---

legally sufficient evidentiary basis for a reasonable jury to find for" the plaintiff. *Id.*

**11.** The Congressional response to *Price Waterhouse v. Hopkins,* 490 U.S. 228 109 S.Ct. 1775 (1989) (holding an employee cannot recover if the employer proves a legitimate reason that would necessitate the same employment deci-

sion absent discriminatory criteria), was contained in the Civil Rights Act of 1991, which states in part that "an unlawful employment practice is established when the complaining party demonstrates that race ... [or] sex ... was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e–2(m).

1113 n. 33 (7th Cir.1992) (when the plaintiff can offer no direct "smoking gun" evidence, he can utilize the *McDonnell Douglas* burden shifting method for relief); *Wold v. Fellows Corp.*, 987 F.Supp. 662, 666 (N.D.Ill.1997) (recognizing the need for "smoking gun" direct evidence); *Siwik v. Marshall Field & Co.*, 945 F.Supp. 1158, 1163 (N.D.Ill.1996) (holding that statement by decisionmaker that employee was fired because he was over 40 years old was the "proverbial 'smoking gun'" needed in the mixed motive analysis); *Finnegan v. Trans World Airlines, Inc.*, 767 F.Supp. 867, 876 (N.D.Ill.1991) (plaintiff must show that the alleged remark was made by the decisionmaker in connection with the discriminatory act).

However, "remarks *and other evidence* that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination," even short of an admission of illegal motivation, or "smoking gun." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir.1999) (*emphasis added*); *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir.1999); *Robinson v. PPG Indus., Inc.*, 23 F.3d 1159, 1164–65 & nn. 2–3 (7th Cir.1994); *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir.1990). *See also, Kennedy*, 140 F.3d at 724 (direct evidence of discrimination exists when isolated comments are contemporaneous with or causally related to the decision making process) (quoting *Geier*, 99 F.3d at 242); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir.1997).

At first blush, the administrators' comments that Rayl was not hired because of his race and gender would appear to be admissible as direct evidence of discrimination. *Wagner v. Kester Solder Company*, No 94–C–6039, 1995 WL 399484, at *7 (N.D.Ill.1995). *See also, Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 55 (2d Cir. 1998) (comments, together with other evidence, sufficient to show policy of discrimination); *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1216 (3d Cir.1995) (comments by nondecisionmakers regarding hiring policy are relevant to age discrimination claim);

*Hybert v. Hearst Corp.*, 900 F.2d 1050, 1053 (7th Cir.1990) (statements reflecting management's policy were properly admitted as evidence of discrimination); *Weber v. Parfums Givenchy, Inc.*, 49 F.Supp.2d 343, 362 (S.D.N.Y.1999) (citing *Buscemi v. Pepsico, Inc.*, 736 F.Supp. 1267, 1270 (S.D.N.Y.1990)) (alleged discriminatory statements by nondecisionmaker relevant when speaker was executive whose position concerned personnel policy). *But see, Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 397 (7th Cir.1997) (statements by a nondecisionmaker amount to mere speculation as to the thoughts of the decisionmaker, and are irrelevant to the analysis); *Sheehan*, 173 F.3d at 1044 (isolated comments that amount to no more than "stray remarks" in the workplace are insufficient to show discrimination).

However, the Seventh Circuit requires more than mere discriminatory comments by a nondecisionmaker to constitute the "smoking gun" needed to survive summary judgment in a mixed motive analysis. Recently, it held that "[s]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" are insufficient to show discrimination. *Emmel*, 95 F.3d at 632 (citing *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804–05). In *Emmel*, the court found sufficient evidence of direct discrimination to uphold a jury verdict because the plaintiff had presented discriminatory comments, together with other evidence to show unlawful discrimination. *Emmel*, 95 F.3d at 632. Moreover, the comments addressed a hiring policy and were made by top policymakers who were "ultimately responsible for the company's employment practices." *Id.See also, Cullen*, 195 F.3d at 323 (jury verdict upheld when there was evidence that an executive who reviewed personnel decisions made discriminatory comments, and this together with other evidence supported an inference of discrimination).

These cases, read narrowly, demonstrate that comments, even if they reflect a discriminatory hiring policy, must

be made by the decisionmaker, or possibly a top policymaker, or must be supported by other evidence of discrimination to be cognizable under the mixed motive analysis.[12] *See also, Mooney v. Aramco Serv. Co.*, 54 F.3d 1207, 1218 (5th Cir.1995) (statements by nondecisionmaker that plaintiff had a "good case of age discrimination" and that it "must have been your age" did not provide direct evidence of age related animus); *Kneibert v. Thomson Newspapers, Michigan Inc.*, 129 F.3d 444, 452–53 (8th Cir.1997) (statement by person with no decisionmaking authority that plaintiff "was not terminated because of his ability or his quality of work but because of a litigation that he is involved in" did not constitute direct evidence); *Ahrens v. Perot Sys. Corp.*, 39 F.Supp.2d 773, 781 (N.D.Tex.1999) (statements by supervisor and fellow employees might be sufficient to infer a discriminatory motive, but were insufficient to constitute direct evidence of discrimination under mixed-motives analysis); *Edwards v. Schlumberger–Well Serv.*, 984 F.Supp. 264, 275 (D.N.J. 1997) (statements by nondecisionmaker that plaintiff was terminated because she was female were not "discriminatory statements made in the decisionmaking process, but rather were statements about discriminatory views held by decisionmakers" and therefore were insufficient to satisfy the burden in a mixed motive analysis); *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir.1999) (statement that police chief would never send a female to the academy did not "bear directly on the contested employment decision" so as to trigger a mixed motive standard of liability); *Cf. Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096–97 (3d Cir.1995) (statement by manager that superior gave directives to consider age during work assignments and "doctor" performance appraisals was sufficient to warrant

mixed-motives jury instruction); *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991) (statement made during the decisional process by individuals responsible for employment decisions that older employees have problems adapting to changes and to new policies was sufficient to invoke *Price Waterhouse*); *Bauer v. Metz Baking Co.*, 59 F.Supp.2d 896, 903 (N.D.Iowa 1999) (issue over whether supervisor who made discriminatory comments had role in decisionmaking process sufficient to preclude summary judgment).

Here, Rayl admits that most of his evidence of race or gender discrimination stems from statements by administrators regarding hiring criteria for the Aide positions. *See* Pl. resp. to 12/9/99 order at 2.[13] Since these statements were made in direct response to questioning by Rayl regarding his failure to be hired, they are related to the employment decision. Therefore, our inquiry focuses on whether the alleged statements were made by decisionmakers. *See Emmel*, 95 F.3d at 632 ("[s]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" are insufficient to show discrimination).

Although the FWCS administrators who made the alleged discriminatory comments were not directly involved in making the hiring decisions for the four Aide positions, Rayl may still prevail if he can show they influenced the hiring decisions or had power over them. (Rayl response to 12/9/99 order at 4). *See, e.g., Emmel*, 95 F.3d at 632 (comments addressing company policy made by top policymakers who were "ultimately responsible for the company's employment practices" may be sufficient direct evidence); *Wold*, 987 F.Supp. at 666 (distinguishing statements made by an individual that discussed termination with the decisionmaker); *Bauer*, 59 F.Supp.2d at 903 (issue over whether supervisor who

---

**12.** Although the court in *Cullen* used an indirect analysis instead of the mixed-motive analysis, the case still supports the proposition that comments need to be made by a decisionmaker, or at least must be supported by other evidence to prove discrimination.

**13.** While it is unclear whether all the statements were made by administrators, for purposes of summary judgment, we will assume so.

made discriminatory comments had role in decisionmaking process sufficient to preclude summary judgment). Essentially, Rayl is alleging that the administrators' remarks articulate a policy of discriminating against Caucasian males, which is in direct conflict with FWCS's written policy forbidding employment discrimination based on race or sex.[14] While Rayl asserts that the administrators he talked to represent "persons in authority," similar to top policymakers in *Emmel* or the executive who reviewed personnel decisions in *Cullen*, he has not even raised an inference that these administrators truly had any authority. After all, the evidence fails to show that they had any influence over the personnel decisions, had the ability to review them, or could in any way dictate FWCS policy. Indeed, this Court is unaware of any inherent authority granting former supervisors, retired principals, employment specialists, or the director of personnel a role in determining FWCS policy, much less the decisionmaking process. Instead, such powers are reserved for the school board, the school corporation's governing body. *See* Ind.Code. § 20–5–2–2 (1997). Thus, Rayl has failed to show that the administrators influenced the hiring decisions at issue here.

■ Moreover, Rayl failed to show that the actual decisionmakers believed that the Aide positions were reserved for women

and African Americans, or that they used these criteria in their hiring decisions. Thus, the administrators Rayl talked to were merely speculating on each decisionmakers' state of mind, and therefore their comments are insufficient as direct evidence of discrimination. *See Chiaramonte*, 129 F.3d at 397 (statements by a nondecisionmaker amount to mere speculation as to the thoughts of the decisionmaker, and are irrelevant to the analysis).

■ Furthermore, even if we were to accept these speculative comments by school administrators as sufficient to infer a discriminatory intent, Rayl still has not presented "other evidence" to substantiate his claim. *See Emmel*, 95 F.3d at 632–33 (remarks that corroborate other evidence are sufficient to support discrimination claim); *Sheehan*, 173 F.3d at 1044 ("remarks *and other evidence* that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination"). Thus, the Court is left with isolated remarks by nondecisionmakers that purportedly reflect a policy of discrimination, but which are unsubstantiated by those with decisionmaking authority, and unsupported by any other evidence.[15] These remarks are simply insufficient to constitute the direct "smoking gun" evidence necessary to shift the burden under the mixed-motives analysis.[16]

14. The actual provision states as follows:
Fort Wayne Community Schools supports the principle that all persons are entitled to equal employment opportunity without regard to race, religion, color, marital status, national origin, sex, age, disability, or limited English proficiency, or any other personal characteristics.
FWCS Student Rights and Responsibilities at 17. (Def.Exh.D1).

15. Rayl attempts to present statistical evidence of hiring disparities by alleging that of fifty-three Aide positions, only two are held by white males. However, this evidence is simply a statistical snapshot, and without a breakdown of the applicants, it is impossible to determine whether it is probative of discrimination. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 650–51, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733 (1989) ("proper com-

parison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market.") (quoting *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977)); *Vitug v. Multistate Tax Commission*, 88 F.3d 506, 513 (7th Cir.1996) (recognizing that plaintiff needs to offer statistics comparing defendant's hiring and promotion rates of discriminated group with data from the industry as a whole); *see also, Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir.1996) (plaintiff who wants the court to infer discrimination from statistical data must present evidence regarding the number and age of applicants not promoted).

16. Since Rayl failed to present sufficient direct evidence to establish an unlawful employment practice under 42 U.S.C. § 2000e–2(m),

## 2. Rayl's "Reverse Discrimination" Claim Fails

Although Rayl failed to show direct evidence of discrimination, his claim may survive if he can establish reverse discrimination using the *McDonnell Douglas* burden shifting analysis.[17] Under this approach, Rayl must first establish a *prima facie* case, which creates a rebuttable presumption of discrimination. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 982 (7th Cir. 1999) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Testerman v. EDS Technical Prods. Corp.*, 98 F.3d 297, 302 (7th Cir.1996)). Once established, the burden of production shifts to FWCS to articulate a legitimate non-discriminatory reason for not hiring Rayl; once FWCS meets its burden of production, the burden shifts back to Rayl to show by a preponderance of the evidence that FWCS's proffered explanation is pretext for race and gender discrimination. *Jackson*, 176 F.3d at 982. However, Rayl always retains the ultimate burden of persuading the trier of fact that FWCS intentionally discriminated against him based upon his race and gender. *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 572 (7th Cir.1998) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

■ To establish his *prima facie* case, Rayl must show that (1) he is a member of a protected class; (2) he applied for, and was qualified for an open position; (3) he was rejected; and (4) the employer filled the position with a person not in his protected class, or the position remained open.[18] *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir.1999). Rayl was clearly rejected for the Aide positions he applied for, and they were all filled by people not within his combined racial and gender status. Thus, our inquiry here focuses on whether Rayl is a member of a protected class and whether he was qualified for the Aide positions.

■ Since Rayl is a white male, he is not a member of a traditionally protected class. *See Mills*, 171 F.3d at 454. However, "it is well settled law that the protections of Title VII are not limited to members of historically discriminated-against groups." *Mills*, 171 F.3d at 454 (citing *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Greenslade v. Chicago Sun–Times, Inc.*, 112 F.3d 853, 863 (7th Cir.1997)). To establish a *prima facie* case in a reverse discrimination suit, in lieu of showing membership in a protected class, a plaintiff must show at least one "background circumstance" which supports an inference that the defendant is "one of those unusual employers who discriminates against the majority." *Mellinger v. Combined Ins. Co. of America*, 2000 WL

---

we need not address whether Rayl was qualified for the positions or whether FWCS would have taken the same action absent the discriminatory criteria.

17. In his response to summary judgment, Rayl stated that as a white male he was not in a protected class for either race or gender and thus "not entitled to proceed under the burden-shifting paradigm of *McDonnell Douglas*." (Pl. resp. at 6). The Court pointed out that this was an incorrect statement of law, and requested further briefing if Rayl intended to proceed under the *McDonnell Douglas* analysis. *See*, January 12, 2000 order. On January 24, 2000, Rayl filed a brief alleging reverse discrimination under the *McDonnell Douglas* analysis.

18. FWCS contends in its supplemental response filed on February 2, 2000 that this is a failure to promote case, and therefore, to establish a *prima facie* case Rayl must show that (1) he is a member of a protected group; (2) he applied for and was qualified for the position; (3) he was rejected for the position; and (4) those who were promoted had similar or lesser qualifications for the position, or other evidence from which one can infer that the plaintiff was denied promotion for a discriminatory reason. *Pafford v. Herman*, 148 F.3d 658, 669 (7th Cir.1998). As discussed more fully *infra*, Rayl cannot establish the fourth prong under this standard. However, in order to afford Rayl every opportunity to make out a claim, we will analyze Rayl's *prima facie* case under the more favorable formulation of *Mills*, which, interestingly enough, is also a failure to promote case.

12439, at * 2 (N.D.Ill. Jan.3, 2000) (quoting *Mills,* 171 F.3d at 455). While the Seventh Circuit recognized that the contours of a "background circumstance" are imprecise, it suggested that a plaintiff could satisfy this prong by showing (1) "some reason or inclination to discriminate invidiously against whites or men, and evidence indicating that there is something 'fishy' about the facts of the case at hand;" or (2) "the person ultimately hired was clearly less qualified than the plaintiff, the hiring authority expressed intense interest in hiring a woman [or minorities], [or] there was a pattern of hiring women [or minorities] in the past;"[19] or (3) that "[he] was the only white employee in the department and all of the decision makers were [African American]." *Mills,* 171 F.3d at 455–457 (internal quotations omitted) (citing *Duffy v. Wolle,* 123 F.3d 1026, 1036–37 (8th Cir.1997); *Reynolds v. School Dist. No. 1, Denver, Colorado,* 69 F.3d 1523, 1534 (10th Cir.1995); *Harding v. Gray,* 9 F.3d 150, 153 (D.C.Cir.1993)).

■ Here, Rayl has successfully set forth "background circumstances" sufficient to support his *prima facie* case. First, Rayl asserts that the hiring authority expressed an intense interest in hiring applicants that were not white males. (Pl. resp. to 1/12/00 order). According to the alleged statements by FWCS administrators, the Aide positions were actually reserved for minorities and females (Rayl dep. at 68). This interest in hiring minorities was further evidenced by the alleged statement that "Black children relate better to Black adults." (Rayl dep. at 21). FWCS asserts that these statements are insufficient since they were made by persons with no decisionmaking authority. Notwithstanding that assertion, the statements are arguably relevant to the discrimination analysis, *see supra,* and raise at least an issue of fact whether FWCS had an "intense interest in hiring a [minority or a] woman" sufficient to satisfy the *prima facie* case.

Moreover, Rayl also contends that FWCS had an incentive to discriminate against him because they were given "special rights from the federal government to ... promote [minorities]." (Rayl dep. at 69). This also raises at least an inference that FWCS had "some reason or inclination to discriminate invidiously against whites [or men]," especially given the imprecision with which "background circumstances" are defined. *See Mills,* 171 F.3d at 455 (quoting *Harding v. Gray,* 9 F.3d 150, 153 (D.C.Cir.1993)).

Finally, Rayl asserts that a sufficient pattern of hiring applicants that excludes white males exists and that this constitutes a background circumstance under the *prima facie* case. At this stage, Rayl must simply show a pattern that women and minorities were given the positions, and he has satisfied this burden by alleging that

19. FWCS contends that all three prongs be met before a "background circumstance" exists. While there is some authority to support this interpretation of *Mills, see Burton v. Southwestern Bell Mobile Sys., Inc.,* 74 F.Supp.2d 841, 846–47 (C.D.Ill.1999), we think it is incorrect. While the actual language in *Mills* uses the conjunction "and" to connect the three circumstances, the language in *Duffy,* the case *Mills* relies on, indicates that each scenario should be treated as a separate background circumstance. *See, Duffy,* 123 F.3d at 1037 ("We conclude that Duffy has made a *prima facie* case of employment discrimination.... Duffy has *alleged three 'background circumstances* [to] support the suspicion that the [defendant] is that unusual employer who discriminates against the majority.' These background circumstances are: (1) that McPhillips was substantially less qualified than Duffy; (2) Chief Judge Wolle had mentioned an interest by someone in the Administrative Office in the recruitment of a female; and (3) that two members of the Panel had usually hired female law clerks." (internal citations omitted, emphasis added)). Thus, the original case treated each of these factors as separate "background circumstances," and we do not believe the Seventh Circuit intended to vary the analysis in its recitation in *Mills.* Since each of the factors are separate background circumstances, Rayl need only show that one existed to satisfy this prong of the *prima facie* case. *See Mills,* 171 F.3d at 457 ("a plaintiff in a reverse discrimination case must show at least one of the background circumstances these other courts have alluded to.").

only two of fifty-three Aide positions were filled by white males.[20] *See, e.g., Duffy,* 123 F.3d at 1037 (alleging members of the panel usually hired females was sufficient to create the *prima facie* case). Thus, Rayl has alleged three background circumstances sufficient to satisfy this prong of the *prima facie* case.

Since Rayl has presented sufficient "background circumstances" to satisfy the first (modified) prong of his *prima facie* case, we must now address within that framework whether he was qualified for the Aide positions. Because this is a *prima facie* case with minimal burdens, Rayl's self-serving declarations regarding his own ability may create a material dispute regarding his qualifications.[21] *Roberts v. Separators, Inc.,* 172 F.3d 448, 451 (7th Cir.1999) (citing *Gustovich v. AT & T Communications, Inc.,* 972 F.2d 845, 848 (7th Cir.1992) ("[self serving] statements may create a material dispute about the employee's ability")). Rayl contends that he was qualified for the Aide positions because he satisfied all the qualification requirements on the job postings. The general position description required that a candidate meet these qualifications: "[s]hould be a mature person who has had previous experience working with school age students. Should have some college training and be knowledgeable and understanding of the social and cultural structure of our community." (Def. Deposition Exh. J). Rayl's previous experience working with school age students was through a bus safety program he presented to children for three years, and his work with a

little league team. His four year business degree, as well as being half-way through a Master's degree program, is evidence that he met the requirement for "some college training." Additionally, volunteering at a homeless shelter at least arguably allows someone to gain knowledge of the social and cultural structure of a community. Thus, it could be deemed that Rayl met the minimum qualifications for the Aide positions, satisfying the last prong of his *prima facie* case, and creating an inference that the employment decisions were based on his race and gender. *See Pitasi v. Gartner Group, Inc.,* 184 F.3d 709, 716 (7th Cir.1999).

Since Rayl has made out a *prima facie* case, FWCS must now produce a legitimate, nondiscriminatory reason for its decision not to hire him. FWCS contends that it decided not to hire Rayl because he lacked qualifications (experience within the job description), had past poor work performance, and other candidates were more qualified. (Br. summ. judg. at 19–24, Reply br. at 9–10, Feb. 2 resp. at 4). Thus, FWCS has satisfied its burden to show a legitimate, nondiscriminatory reason for its decision. *Vitug,* 88 F.3d at 516 (decision not to hire candidate because he was not the most qualified is a sufficient legitimate nondiscriminatory reason); *Roberts,* 172 F.3d at 451 (poor work performance is a legitimate, non-discriminatory reason sufficient to shift the burden back to the plaintiff). Therefore, the burden shifts back to Rayl to show that these reasons were merely pretextual.

20. FWCS contends that if the Court will look at the racial and gender hiring statistics individually, rather than simply looking at the numbers of "white males" that occupy the Aide positions, it will see that the statistics do not suggest discrimination. *See,* Supp.Resp. Feb. 2. Indeed, out of fifty-three Aide positions, twenty-four were occupied by males and eleven were held by Caucasians. These statistics hardly suggest discrimination for any protected group. However, Rayl alleges that his status as a "white male" provoked the discrimination, not his status in either group individually. Therefore, for purposes of analysis, we will examine the statistics in relation to Rayl's status as a white male.

21. FWCS argues that Rayl's own subjective belief that he is qualified is insufficient to establish a *prima facie* case under *Fortier v. Ameritech Mobile Communications, Inc.,* 161 F.3d 1106, 1114 (7th Cir.1998). However, *Fortier* actually states that "subjective self-appraisal ... cannot create a genuine issue of fact *regarding the honesty* of [the defendant's] assessment of [the plaintiff's] performance." *Id.* (emphasis added). Thus, a plaintiff's subjective belief is sufficient to establish a *prima facie* case, but is insufficient to show pretext.

"[P]retext" is a lie or a phony reason for an employment decision. *See Richter v. Hook–SupeRx, Inc.*, 142 F.3d 1024, 1029–30 (7th Cir.1998). To show pretext, Rayl must establish that FWCS's proffered reasons were factually baseless, that they were not the actual motivation, or that they were insufficient to motivate FWCS's decision not to hire him. *Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir.1999) (citing *Wolf v. Buss (America), Inc.*, 77 F.3d 914, 919 (7th Cir.1996)). However, courts "[do] not sit as a super-personnel department that reexamines an entity's business decisions." *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 809 (7th Cir.1999) (citing *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986)). Therefore, Rayl cannot prevail if FWCS "honestly believed in the nondiscriminatory reason[ ] it offered, even if the reason[ ][is] foolish or trivial or even baseless." *Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 890 (7th Cir.1997); *Wolf*, 77 F.3d at 919.

Rayl asserts that FWCS's proffered reasons did not actually motivate its hiring decision. At this stage, Rayl must produce independent evidence that shows that FWCS did not honestly believe he had poor work performance, that he was not qualified because of inexperience within the job description, and that he was not the most qualified candidate. *See Roberts*, 172 F.3d at 452; *Vakharia*, 190 F.3d at 808–09. This Court will not "sit in review of an employers' appraisal of applicants' qualifications unless the plaintiff puts forth some tangible evidence to show that the employer's decisions were motivated by improper factors." *Vitug*, 88 F.3d at 516. Here, Rayl contends that statements of an illegal discriminatory policy by administrators, having only two white males out of a total of fifty-three Aides, and no showing that he is unqualified for the Aide position creates at least an issue of fact as to whether FWCS's proffered reasons for its hiring decision were merely pretextual.

Rayl first offers as pretext the comments by FWCS administrators that a policy existed to discriminate against white males. However, he has offered no evidence that suggests that the actual decisionmakers knew or believed that such a policy existed, much less used race or gender as criteria when making their decisions. Additionally, no evidence was proffered that the administrators who made the remarks were policymakers at FWCS, or that they exerted any influence in the decisionmaking process. *See Hoffman v. MCA, Inc.*, 144 F.3d 1117 (7th Cir.1998) (statements by nondecisionmakers do not create genuine issue of material fact absent proof that non-decisionmaker's statement somehow tainted employment decision).

▉ Moreover, while alleged statements made by nondecisionmakers are admissible as evidence of discrimination, standing alone they do not prove pretext. *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1049 (7th Cir.2000) (in an indirect case, pretext is determined by looking at the alleged discriminatory remarks along with other evidence) (citing *Huff*, 122 F.3d at 385) ("in an indirect proof case, remarks unrelated to the employment decision in question may not overcome summary judgment if they stand alone as evidence of the employer's discriminatory intent"); *see also, Indurante v. Local 705, Int'l Bhd. of Teamsters, AFL—CIO*, 160 F.3d 364, 367 (7th Cir.1998) (stray remarks are probative of discriminatory bias, but standing alone, they are insufficient to demonstrate pretext). Thus, to establish pretext, Rayl must produce additional evidence that suggests that FWCS did not actually believe its proffered reasons for not hiring him for the Aide positions.

To do this, Rayl attempts to statistically show that there is a pattern at FWCS of discriminating against white males for Aide positions. Usually, statistics cannot be used as a primary means of proving discrimination in a disparate treatment analysis. *Kidd v. Illinois State Police*, 167 F.3d 1084, 1102, n. 16 (7th Cir.1999); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343,

349 (7th Cir.1997). However, when used in conjunction with other evidence, "statistics can be probative of whether the alleged disparity is the result of discrimination." *Kidd*, 167 F.3d at 1102, n. 16. Nevertheless, Rayl simply alleges that two out of fifty-three Aide positions were filled by white males without any evidence reflecting the number of white male applicants who were qualified for the positions. The Supreme Court has held that when using statistics, the "proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market." *Wards Cove Packing Co.*, 490 U.S. at 650–51, 109 S.Ct. at 2121 (quoting *Hazelwood Sch. Dist.*, 433 U.S. at 308, 97 S.Ct. at 2741; *Billish v. City of Chicago*, 962 F.2d 1269, 1284 (7th Cir. 1992)). Since Rayl has failed to present evidence to properly analyze these statistics, and given their limited usefulness in a disparate treatment analysis, they must be disregarded.[22]

Rayl also attempts to show pretext by alleging that FWCS has failed to establish that he was not qualified for the Aide positions. However, Rayl misplaces the burden on this issue. Once FWCS articulates legitimate, nondiscriminatory reasons for its decision, Rayl must prove that those reasons are false. *See, e.g., Hasham*, 200 F.3d 1035, 1044 (once the defendant produces legitimate, nondiscriminatory reasons for its decision, the plaintiff must prove by a preponderance of the evidence that the reasons proffered were pretextual for intentional discrimination).

In any event, FWCS asserts that Rayl is not qualified based upon his deposition testimony which reveals a lack of experience within each job description. (*See* Rayl dep. 73–77). More particularly, Rayl conceded that he did not have experience in evening activities such as Back to School nights or family reading nights, he had never assisted in the office area for a principal at any elementary school, he did not have experience keeping tardy records on students, he had never supervised an in-school suspension program, he had never supervised children on the school grounds, he had never conducted a personal home visit with parents concerning a student, nor did he have experience in various other programs implemented at the hiring schools. (Rayl dep. at 73–77).

This obviously raised concerns, not about whether Rayl met the minimal qualifications to apply for an Aide position, but whether he had the depth of experience within the individual job descriptions to be hired.[23] Indeed, FWCS deems experience within the job description as essential to being truly "qualified." (See Br. summ. judg. at 19–24, Reply Br. at 9–10, Res. Feb. 2 at 4). Unfortunately, Rayl has failed to show that he has any real experience as called for in the job descriptions and more importantly, he has offered no probative evidence that FWCS was being dishonest when it concluded that he did not have the "qualifications" for any of the

---

**22.** This is particularly true given the limited sample of statistics that Rayl provides. Before the Court will infer discrimination, the plaintiff must "subject all of the employer's decisions to statistical analysis to find out whether [race or gender] made a difference." *Kuhn v. Ball State Univ.*, 78 F.3d 330, 332 (7th Cir.1996). Rayl has not provided such evidence. Instead, he simply alleges discrimination based on the racial and gender breakdown of Administrative Aides employed at FWCS. Thus, Rayl failed to provide sufficient statistical evidence to raise an inference of discrimination. Moreover, simple comparisons "between [hiring] rates for black and white employees with the racial [and gender]

composition of [FWCS's] workforce" are insufficient to support Rayl's claim of pretext. *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 (7th Cir.1997) (citing *King v. General Elec., Co.*, 960 F.2d 617, 627 (7th Cir.1992)) (straight percentage comparisons not statistically significant).

**23.** The general qualifications required that Rayl "be a mature person who has had previous experience working with school age students. Should have some college training and be knowledgeable and understanding of the social and cultural structure of our community." (Def. Deposition Exh. J).

positions. After all, without any evidence demonstrating that FWCS only uses the "qualifications" portion of the job posting (as opposed to the "description" portion) when considering an applicant, or that FWCS somehow actually believed Rayl the best candidate, there is no basis to even infer that FWCS's proffered reasons for not hiring Rayl were false.

■ Furthermore, since FWCS has alleged three separate reasons for not hiring Rayl, he must demonstrate that all three were pretextual before he can succeed on his discrimination claim. *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 395 (7th Cir.1998) ("[w]here defendants have proffered more than one reason for the dismissal, plaintiff must address all the reasons suggested by the defendants"). However, Rayl is suspiciously quiet about rebutting FWCS's proffered reasons linked to his past work performance, or their assertion that other applicants were more qualified. These are both legitimate reasons for not hiring Rayl, and he has failed to show that they are unworthy of belief. Indeed, the evidence reveals that Rayl had been formally reprimanded, disciplined, and suspended as a bus driver. (Rayl dep. at 49–51, 54–55). Thus, his prior work performance was at least questionable, and FWCS certainly· had a valid reason for not hiring him on this ground alone.

Additionally, FWCS provides factual support for its hiring decisions by disclosing the identities and background experience of the· applicants hired for the Aide positions at issue. As we look at this evidence, we are not to sit as a super-personnel board, *see Vakharia*, 190 F.3d at 809, and the Seventh Circuit has recognized that "[n]o rational enterprise that has several qualified candidates for a position selects among them by lot; it picks the best qualified." *Mason v. Continental Ill. Bank*, 704 F.2d 361, 364 (7th Cir.1983). A simple examination of this evidence shows that each applicant was in fact qualified and also had experience within the job description, something Rayl seemed to

lack. Thus, while Rayl may have met the minimal requirements for the job, the chosen applicants clearly had what FWCS was looking for, and therefore, this Court cannot infer that the School's hiring practices were in any way pretextual. *Cf., Hasham*, 200 F.3d 1035, 1045 (examining the qualifications of the job applicants and holding that the plaintiff's higher test scores and more extensive experience were sufficient to raise pretext issue when the employer claimed it did not hire plaintiff because there was a "more qualified applicant").

"Moreover, it is important to remember that, when we consider whether an employer's justification for [not hiring] its employee is pretextual, the inquiry is not whether the reason for the [hiring decision] was a correct business judgment but whether the decisionmakers honestly acted on that reason." *Bahl v. Royal Indemnity Co.*, 115 F.3d 1283, 1291 (7th Cir.1997) (citing *Emmel*, 95 F.3d at 633). Indeed, employment decisions may be "objectively wrong-headed, so long as they are not unlawfully discriminatory." *Emmel*, 95 F.3d at 633. Here, there is no evidence in the record that disputes the qualifications of the hired applicants, or that suggests that FWCS did not honestly believe the other candidates to be more qualified. Therefore, Rayl has failed to show that FWCS's reasons were pretextual.

In conclusion, Rayl has failed to proffer sufficient evidence to suggest that FWCS's legitimate, nondiscriminatory reasons for not hiring him were phony. Under the *McDonnell Douglas* analysis, "'no one piece of evidence need support a finding of discrimination, but rather the court must take 'the facts as a whole.'" *Hasham*, 200 F.3d 1035, 1049 (quoting *Futrell v. J.I. Case*, 38 F.3d 342, 350 (7th Cir.1994)). Looking at the facts as a whole, the only evidence Rayl presented are statements by nondecisionmakers that FWCS had a policy of not hiring white males for the Aide positions. No facts were presented that these administrators were policymakers or that the actual decisionmakers relied on

this alleged policy in their hiring decisions. Moreover, Rayl does not even factually challenge two of FWCS's proffered reasons for its hiring decisions. Therefore, the statements, without corroborating evidence, or evidence that the actual decision-makers relied upon this alleged policy, are insufficient to show pretext. *Cf., Emmel*, 95 F.3d at 634 (statement that plaintiff was not promoted because "they wanted men in the positions" combined with evidence derived from top executives in the company was sufficient to show pretext); *Cullen*, 195 F.3d at 322 (remarks combined with proof that plaintiff's performance ratings were superior and plaintiff's job duties were taken over by younger employees sufficient to infer age was a factor in the discharge decision). Thus, Rayl's claim for race and gender discrimination fails under the *McDonnell Douglas* analysis.

## B. ADEA Claim

The ADEA prohibits employer discrimination against individuals forty years of age and older, 29 U.S.C. § 631(a), with respect to compensation, terms, conditions or privileges of employment. *Id.* at § 623(a). For Rayl to maintain a claim under the ADEA, he must establish that he would not have been treated adversely by FWCS's "but for" FWCS's motive to discriminate against him because of his age. *Baron*, 195 F.3d at 338; *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 657 (7th Cir.1991) (en banc); *Konowitz v. Schnadig Corp.*, 965 F.2d 230, 232 (7th Cir.1992); *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir.1988) (*Oxman I* ); *see also Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir.1994), *cert. denied*, 515 U.S.

1159, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995).. Similar to his Title VII claims, Rayl may establish age discrimination by successfully navigating one of two courses. First, he may undertake the direct, mixed motive route and present evidence that age was a substantial factor in the adverse employment action, *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir.1994), or he may invoke the indirect burden-shifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to raise an inference of age discrimination. *Konowitz*, 965 F.2d at 232; *Oxman I*, 846 F.2d at 452. Rayl has again elected to proceed down both· avenues on his ADEA claim, so we will address each analysis in turn.

### 1. Rayl's Mixed Motive Analysis Fails.

 Under the mixed motive route, as discussed *supra*, Rayl must produce evidence that "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Kennedy*, 140 F.3d at 724 (quoting *Randle*, 876 F.2d at 569). Again, Rayl asserts that comments by the school administrators are sufficient direct evidence of discrimination. Specifically, he asserts that a remark by a non-decision-making supervisor that, "I would not necessarily disagree that [Rayl was] not hired or given the position because of [his] ... age" is sufficient direct evidence.[24] Rayl also tries to present a statistical disparity by showing that of the twelve administrative aides hired since 1996, seven were under 40 years of age and five were over 40 years of age.[25] However, this Court

**24.** Some question exists whether this lone comment simply constitutes a stray remark instead of evidence of discrimination. *See, e.g., McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 512 (8th Cir.1995) (holding that nondecisionmaker's response of "Yes, I believe that's right" to employee's statement that she was reassigned because of her gender constituted a stray remark and was insufficient to show discriminatory animus). However, to advance the analysis, we will assume that the statement is some evidence of discrimination.

**25.** While five positions were held by people over 40 years of age, only two positions were held by people within ten years of Rayl's age. Thus, only two people were in Rayl's protected class under the ADEA. *See Fisher v. Wayne Dalton, Corp.*, 139 F.3d 1137, 1141 (7th Cir. 1998) (" 'Substantially younger' means at least a ten-year age difference") (quoting *Kariotis v. Navistar Int'l Transp, Corp.*, 131 F.3d 672 (7th Cir.1997))

cannot determine the relevance of these statistics since we have not been favored with evidence of the age characteristics of the applicant pool, making Rayl's statistics meaningless. *See Wards Cove Packing Co.*, 490 U.S. at, 650–51, 109 S.Ct. at 2121 ("proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market.") (quoting *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); *Billish v.. City of Chicago*, 962 F.2d 1269, 1284 (7th Cir.1992)); *see also, Kuhn*, 78 F.3d at 332 (to properly analyze statistics, the court needs to know the number and age of applicants not promoted). Thus, all Rayl is left with is a nondecisionmaker's comment that age may have been a motivating factor in FWCS's decision not to hire him, and, as discussed more fully *supra*, this is simply insufficient to constitute the "smoking gun" needed in a mixed motive analysis.

█ Moreover, even if we were to assume that the comments provided evidence of an impermissible motive, summary judgment is still proper when there is no "genuine issue regarding whether [FWCS] would have made the same employment decision anyway." *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 369 (7th Cir.1998). The evidence presented shows that Rayl did not have any experience within the job descriptions, had a very spotty employment record with FWCS, and that the successful applicants had both qualifications and experience tailor-made for the Aide positions. Thus, the evidence strongly suggests that FWCS would not have hired Rayl to be an Aide "no matter what his age, race, or [gender]" and Rayl's claim under the mixed motive analysis therefore fails. *Abioye*, 164 F.3d at 370.

### 2. Rayl's Indirect Analysis Also Fails

█ Although Rayl failed to produce direct evidence of age discrimination, he can still survive summary judgment if he can show indirect evidence of discrimination under the *McDonnell Douglas* burden-shifting analysis. To establish his *prima facie* case under the ADEA, Rayl must show that (1) he was in the protected age group; (2) he was qualified and applied for the job; (3) he was not hired; and (4) younger employees were treated more favorably.[26] *Weisbrot v. Medical College of Wisconsin*, 79 F.3d 677, 681 (7th Cir.1996). FWCS has conceded that Rayl is a member of the protected age group and that it decided not to hire him, and as we have already discussed *supra*, Rayl was superficially qualified for the positions; therefore, we will only examine whether younger employees were treated more favorably to determine if Rayl has satisfied his *prima facie* case. (Def.Mot. at 12, 24).

Rayl offers only scant evidence that younger employees were treated more favorably. He first tries to present a statistical disparity by showing that of the twelve administrative aides hired since 1996, seven were under 40 years of age and five were over 40 years of age.[27] However, Rayl again neglects to offer sta-

---

**26.** The *prima facie* case simply requires enough evidence to "create an inference that an employment decision was based on an illegal discriminatory criterion." *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 716 (7th Cir.1999) (internal quotations and citations omitted).

**27.** Rayl further dissects these statistics to show that of the five people in the protected class, one was 60 years old, one was 50 years old, and three were under 50 years of age. The Court assumes this is an attempt to show that, at the time of the alleged discrimination,

FWCS employed only two people in Rayl's protected class since he was 60 years old. Indeed, for the Aide positions at issue, one position was filled by Clowers, a forty-three year old, and the other filled by Zock, a forty-four year old, and the other two positions were filled by Rogers and Edmonds, both under forty years of age. Thus, more than a ten year age difference exists between Rayl and all four of the hired applicants, creating the age disparity needed for an ADEA claim. *See Fisher*, 139 F.3d at 1141 ("'Substantially younger' means at least a ten-year age difference") (quoting *Kariotis*, 131 F.3d at 676).

tistics of the applicant pool, and thus we can only speculate as to what these numbers actually mean. However, since all four Aide positions were filled by applicants at least fifteen years Rayl's junior, and so as to complete the record, we will assume that he has met the last element of his *prima facie* case. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) (inference of age discrimination exists when 56 year old plaintiff replaced by 40 year old); *Miller v. Borden, Inc.*, 168 F.3d 308, 313 (7th Cir. 1999) (younger, replacement employees "need not be outside the protected class, *i.e.*, under the age of forty," but they should be at least ten years younger than the terminated employee) (quoting *Maier v. Lucent Tech. Inc.*, 120 F.3d 730, 735 (7th Cir.1997)).

As discussed *supra*, FWCS has articulated three legitimate, nondiscriminatory reasons for not hiring Rayl, and Rayl now has the burden to establish pretext. To fulfill this burden, Rayl presented statements by nondecisionmaking administrators that he was not hired because of his age. However, even if we believe these statements were made, they are only probative of whether those specific administrators had some kind of age animus. As discussed *supra*, there is no evidence that the actual decisionmakers believed that a discriminatory policy based on age existed, or that they viewed Rayl as being too old. Thus, statements by nondecisionmakers that Rayl was not hired because of his age are insufficient to show pretext. *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 574 (7th Cir.1998) (statement by nondecisionmaker insufficient to show pretext under ADEA) (citing *Hoffman v. MCA, Inc.*, 144 F.3d 1117 (7th Cir.1998) (statements by nondecisionmakers do not create genuine issue of material fact absent proof that non-decisionmaker's statement somehow tainted employment decision)).

The only other evidence that Rayl offers to support his claim of age discrimination are the blanket statistics that we have already discounted as being unhelpful.

Again, Rayl has failed to allege or show that FWCS's proffered reasons for not hiring him are unworthy of belief. We cannot second guess FWCS's business decisions, and as discussed *supra*, Rayl has failed to show that his poor work performance, his inexperience within the job description, or that other more qualified candidates applied were not the actual reasons for FWCS's hiring decisions. Therefore, because Rayl has failed to show pretext, his ADEA claim under the *McDonnell Douglas* analysis fails.

### V. CONCLUSION

For the reasons herein stated, the Defendant's motion for summary judgment is GRANTED as to Rayl's Title VII claims and his ADEA claim. The Clerk is directed to enter judgment in favor of the Defendant.