Suzanne DeWEESE, Plaintiff,

v.

**DAIMLERCHRYSLER CORPORATION, Defendant.**

**No. IP99–1064–C–B/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

Nov. 13, 2000.

Gregory A. Stowers, Stowers Weddle & Henn, Indianapolis, IN.

Susan B. Tabler, Ice Miller, Indianapolis, IN.

## ENTRY GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiff, Suzanne DeWeese ("DeWeese"), alleges that Defendant, DaimlerChrysler Corporation ("DaimlerChrysler"),[1] discriminated against her by refusing to hire her because of her age, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* (Count I), and because of her race, in violation of both Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000 *et seq.* (Count II), and 42 U.S.C. § 1981 (Count III). Defendant responds that DeWeese was not qualified for the position, that there are no background circumstances tending to suggest that race was an issue, and that it had a legitimate business justification for failing to hire DeWeese. Defendant has accordingly filed a motion for summary judgment on all counts, pursuant to Federal Rule of Civil Procedure 56. For the reasons discussed below, we *GRANT IN PART* and *DENY IN PART* Defendant's motion for summary judgment.

### Background

In October of 1997, DaimlerChrysler employed three full-time occupational health nurses at its Indianapolis Foundry. Def.'s Statement of Material Facts in Supp. of Mot. for Summ. J. ("Def.'s Facts") ¶ 1. The first-shift nurse was Viola Stanley ("Stanley"), a fifty-year-old Caucasian female who had worked for Defendant for thirty-one years; the second-shift nurse was Patricia Johnson ("Johnson"), a forty-nine-year-old African–American female who had been employed by Defen-

dant for three years; and the third-shift nurse was Karen Overpeck ("Overpeck"), an approximately fifty-yearold Caucasian female, who had been with Defendant for nearly thirty-one years. *Id.* ¶¶ 2–4, 8–10, 14–16. Overpeck retired in the Fall of 1997, creating a vacancy for a full-time occupational health nurse on the third shift. *Id.* ¶ 17. DeWeese (a fifty-year-old Caucasian female) applied for this position and DaimlerChrysler's decision to hire Antonio Preyer (a twenty-nine-year-old African American male) instead of DeWeese led to this lawsuit.

On October 5, 1997, Defendant placed the following advertisement for the open position in the *Indianapolis Star:*

> An Indianapolis foundry division of a Fortune 100 company has immediate opening for an occupational health nurse. The qualified candidate must have at least two years of experience in occupational health, emergency room, or intensive care nursing; must be an R.N. with a current Indiana license; and be computer literate. The successful candidate will receive a highly competitive wage and benefit package.

*Id.* ¶¶ 19–20 (quoting Pl.'s Dep. Ex. 2). This advertisement leads to the first factual dispute between the parties, to wit, whether to qualify for the position the applicant was required to have two years of experience in at least one of the designated settings (occupational health, emergency room, or intensive care nursing) or whether two years of experience in any combination of the three settings was satisfactory.

Defendant asserts that it intended the position to require two years of combined experience in any of the three designated fields. *Id.* ¶ 21. It supports this assertion with the deposition testimony of Willie A. Bush, Jr. ("Bush"), an African–American male who has been a Human Resource Senior Manager at the Foundry since 1985 and was the person responsible for making

---

1. Defendant was erroneously named as "Da-    imler Chrysler Corporation" in the complaint.

hiring decisions. *Id.* ¶¶ 43–45.[2] In his deposition, Bush testified that he was unaware of who produced the advertisement in question, as he himself did not have any role in drafting or running such advertisements; however, Viola Stanley testified that she had created the advertisement at Bush's request. Bush Dep. at 29–30;[3] Pl.'s Statement of Additional Material Facts ¶ 143. Bush further testified that it was his belief that the advertisement meant that the minimum qualifications for the occupational health nursing position required two years of experience in a combination of intensive care nursing, emergency room nursing, and/or occupational health nursing. *Id.* at 30–31.

DeWeese disputes this characterization of the position's requirements, claiming that the position required at least two years of experience in one of the three nursing areas listed. In support of her position, she cites the (at best ambiguous) text of the advertisement quoted above. Pl.'s Resp. to Def.'s Statement of Material Facts ("Pl.'s Resp. to Def.'s Facts") ¶ 21.[4] She also cites the deposition testimony of Stanley, but our review of that testimony reveals no reference to whether the two years of experience were intended to be a combination of the three areas or in one area alone. Pl.'s Statement of Additional Material Facts ("Pl.'s Additional Facts")

¶ 144; Stanley Dep. at 12. In response to the ambiguities in the text of the advertisement and the various efforts to interpret it, DeWeese has provided no evidence to directly contradict the testimony of Bush, the actual decision maker in this case, who has provided the employer's explanation for what the position required. Lacking any evidence to the contrary, based on Bush's testimony, we must assume that the full-time nurse position advertised by Defendant required a minimum of two years nursing experience in a combination of intensive care, emergency room, and occupational health settings.

Bush also testified that sometime between 1994 and 1996 DaimlerChrysler instituted a policy that, whenever possible, it would hire employees with four-year college degrees to fill salaried or management positions. Def.'s Facts ¶ 22 (citing Bush Dep. at 23, 24); *compare* Bush Dep. at 23–24 (stating that policy was instituted five or six years ago) *with* Bush Dep. at 26 (testifying that as of 1995 or 1996 he was required to obtain specific authorization to hire someone without a four-year degree for a staff nurse position). According to Bush, this policy was imposed to upgrade the educational level of DaimlerChrysler's workforce, thereby enhancing its mobility and flexibility. Def.'s Facts ¶¶ 23–24; Bush Dep. at 23–24, 46.[5] Indeed, Bush

2. Plaintiff responds to several of Defendant's factual assertions by stating "[w]ithout sufficient knowledge to dispute or not dispute." *E.g.*, Pl.'s Resp. to Def.'s Facts ¶ 44. Under the local rules, any of the moving party's properly substantiated factual assertions are admitted to exist without controversy *"except to the extent that such facts are specifically controverted or objected to* in compliance with L.R. 56.1(f)." S.D. Ind. R. 56.1(g) (emphasis added). Plaintiff's response quoted above does not specifically controvert or object to Defendant's factual assertions and such assertions are thus considered to be undisputed for the purpose of this motion.

3. Each party submitted excerpts of the Bush Deposition in support of its legal position; unfortunately, a pagination error led to discrepancies between the two submissions. The parties have since filed a complete copy

of the deposition testimony and to avoid further confusion, all references in this entry to this testimony will be to this later-filed, complete deposition transcript.

4. Plaintiff's Response to Defendant's Facts erroneously omits Defendant's paragraph 20 and its responses to the subsequent paragraphs are therefore misnumbered. To avoid compounding the error, we cite the paragraph number from Defendant's Facts when we refer to the plaintiff's response to that paragraph.

5. Although Bush indicated that this policy might possibly have been set out in a written memorandum, he was unable to produce such a document at his deposition and none has been provided to the court.

was responsible for tracking the educational levels of all DaimlerChrysler foundry employees, from hourly line workers all the way up to and including its highest management official. Def.'s Facts ¶ 25.

In furtherance of this policy, Bush endeavored to fill every salaried or management employment position with a candidate who had a four-year college degree, regardless of whether such a degree was a specific requirement of the position. Def.'s Facts ¶ 28. In fact, Bush testified that he did not have authorization to hire someone for a salaried or management position who lacked a four-year college degree. Bush Dep. at 26. Hiring a person without a four-year college degree for most salaried or management positions required a special exemption from Daimler-Chrysler headquarters. Def.'s Facts ¶ 26. Bush testified that following Daimler-Chrysler's institution of this policy/preference for four-year college degrees, Bush had requested only four or five special exemptions to allow the hiring of a salaried or management employee without the desired degree. Def.'s Facts ¶ 27.

The parties dispute whether the occupational health nurse position fits into the class for which a four-year degree was preferred. DaimlerChrysler maintains that it was a salaried position, citing Bush's affidavit, while DeWeese asserts that "nurses are paid on an hourly basis and are paid substantial overtime pay." *Compare* Def.'s Facts ¶ 29 *with* Pl.'s Resp. to Def.'s Facts ¶ 29. However, DeWeese does not cite any evidence to support her

position. *Cf.* S.D. Ind. L.R. 56.1(f)(3) (requiring that objections to a material fact include citation to appropriate authority).[6] Bush testified in his deposition that, at the time of Preyer's hiring, in order to fill the occupational health nurse position, he was required to obtain authorization if the candidate lacked a four-year college degree. Bush Dep. at 26–27.

Although these facts suggest that a four-year degree was desirable, DaimlerChrysler would have us believe that a four-year degree was a requirement for the occupational health nurse position. This contradicts Bush's testimony which clearly indicates that such a degree was not required. Bush Dep. at 27–28, 30–31, 45–46; Pl.'s Additional Facts ¶ 155 (asserting that the Indianapolis Star advertisement contained the minimum qualifications for the position). Thus, we conclude that, while there was a preference for a four-year Bachelor of Science degree in nursing, it was not a requirement for the position.

As the table below shows, nine people applied for the open occupational health nurse position, four of whom had a four-year Bachelor of Science in Nursing degree, seven of whom were Caucasian and two, African–American; three of the applicants already worked at DaimlerChrysler as per diem nurses. Def.'s Facts ¶¶ 31–35, 37.[7] Per diem nurses worked part-time, on an as-needed basis as a supplement to the full-time salaried occupational health nurses. Def.'s Facts ¶ 38; Bush Dep. at

---

6. Plaintiff does relate certain facts pertaining to the hiring of Johnson as a staff nurse. Bush hired Johnson as an occupational health nurse in 1994, even though she had only a two-year Associate degree and not a four-year Bachelor of Science degree. Pl.'s Additional Facts ¶¶ 158–60. As noted above, Bush's testimony makes it unclear whether the Defendant first instituted the four-year degree preference in 1994, 1995, or 1996. Bush Dep. at 23–26. In addition, Bush testified that he could not remember whether the four-year degree preference was applied to the staff nurse position before or after Johnson's hiring. *See* Bush Dep. at 26–27. Moreover,

Bush was also confused as to the actual date when Johnson was hired, testifying that it occurred in either 1995 or 1996, rather than in 1994. *See* Bush Dep. at 24.

7. The information contained in this table is derived from Defendant's Facts ¶¶ 36, 39, 48–49, 54–55, 78–79, and Plaintiff's Deposition Exhibit 9, 11, 12. DaimlerChrysler's application did not elicit the applicant's age or race; this information was provided as factual assertions in support of this motion. *E.g.*, Pl.'s Dep. Ex. 4.

11; Pl.'s Additional Facts ¶ 129.[8] Per diem nurses received no advantages in the application process over other applicants for the occupational health nurse position. Def.'s Facts ¶ 40.[9]

## Applicants

| Name | Age | Race | Education | Per Diem Status |
| --- | --- | --- | --- | --- |
| Natalie Carr ("Carr") | Unknown | Caucasian | B.S. nursing | No |
| Suzanne DeWeese (Plaintiff) | 50 | Caucasian | Associate Degree | Yes |
| Annie Hall ("Hall") | Unknown | Caucasian | B.S. nursing | No |
| Kathleen Murphy ("Murphy") | Unknown | Caucasian | Associate Degree | No |
| Tammy Perry ("Perry") | Unknown | Caucasian | B.S. nursing | Yes |
| Antonio Preyer ("Preyer") | 29 | African–American | B.S. nursing | No |
| Shana Scott ("Scott") | Unknown | African–American | Associate Degree | No |
| Kay Shipley ("Shipley") | Unknown | Caucasian | Associate Degree | Yes |
| Catherine Vanderpool | Unknown | Caucasian | Associate Degree | No |

As noted previously, Bush was the DaimlerChrysler official who made the hiring decision with respect to filling the vacant occupational health nurse position. Def.'s Facts ¶ 44. Liz Gigax, a Caucasian female Personnel Administrator, helped Bush review the applications, but only Bush conducted the personal interviews with the nine applicants. Bush Dep. at 33, 35; Def.'s Facts ¶¶ 92–93. The two, already employed occupational health nurses, Johnson and Stanley, made recommendations to . Bush and Gigax concerning the applicants, but they had no official decisionmaking role with respect to the vacancy. See Bush Dep. at 34.[10] Johnson told Bush that she preferred Preyer, while Stanley ranked Shipley first and then DeWeese. Id.[11] Stanley also provided

8. There is also a class of nurses described as "contract nurses" who in terms of duties are similar to per diem nurses, except that their pay comes from a third party rather than Defendant. Bush Dep. at 11.

9. DeWeese disputes this testimony, relying on deposition testimony by Stanley and Johnson that a per diem nurse would have required less training to learn Defendant's system than the other applicants, arguably a factor in favor of choosing a per diem nurse to fill the vacancy. Pl.'s Resp. to Def.'s Facts ¶ 40. However, Defendant's assertion is about whether the process itself provided any advantages to per diem nurses and the testimony cited by DeWeese does not contradict that assertion.

10. The staff nurses played a similar role in terms of the hiring of per diem or contract nurses; their suggestions were welcomed, but Bush was not obligated to follow them. Bush Dep. at 10–11.

11. Stanley appears to have interviewed all of the "outside" candidates (i.e. the candidates who were not "per diem" nurses). Pl.'s Additional Facts ¶ 145. Stanley testified that she did so at Bush's request in order to show them around the department and explain the daily responsibilities of the vacant position. Stanley Dep. at 15. Stanley also ranked the candidates, placing DeWeese second and Preyer no better than sixth. Bush Dep. at 34; Pl.'s Additional Facts ¶ 157. Despite making known her personal preferences, Stanley testified that she did not "make the decision on

comments on certain candidates, which, though unsolicited by Bush, were considered by him during the hiring process. *Id.* at 36–37; Pl.'s Additional Facts ¶ 145.

The interview process involved discussions between Bush and each applicant regarding the candidate's application. Rather than taking notes, Bush contemporaneously filled out an "Interviewer's Report" on which he rated the candidate's education, experience, and skills and competencies on a scale of one to three. *E.g.* Pl. Dep. Ex. 4 ("Preyer App.").[12] The candidates with a B.S. degree in nursing received the highest possible educational rating (three), while the remaining candidates who had only an Associate degree received the lowest possible educational rating (one). Scott was the exception: she received a two rating, having obtained her degree only three years prior. *See* Pl. Dep. Ex. 4–12; Bush Dep. at 65, 76.[13]

The rating system for experience appears to have been applied much more subjectively. Bush testified that the ability of the candidate to sell himself/herself was one factor he considered. *See* Bush Dep. at 67–68. In choosing Preyer to fill the vacancy, Bush admitted that Preyer's resume and application reflected at most two or two-and-a-half years of post-school nursing experience. Bush rated Preyer's experience level as a three, that is "clearly above job requirements." Bush Dep. at 90–91; Preyer App. Bush stated that Preyer also had experience from clinical clerkships performed which he participated in while working toward his B.S. Bush testified that he made his rating of Preyer's experience by "looking at the whole package." Bush Dep. at 67–68.

DeWeese contends that Preyer's experience was insufficient to meet even the position's minimum requirements. DeWeese's assessment reflects her view that the job required two years of experience in one of the three designated areas of nursing as opposed to a combination of experience among the three areas; as we have previously noted, this is an interpretation we do not share. DeWeese also notes that Preyer had had no experience in an intensive care unit or emergency room and only nine months of occupational health experience. *See* Pl.'s Resp. to Def.'s Facts ¶ 52 (citing Preyer Dep. at 29–30; Pl. Dep. Ex. 4; Indianapolis Star advertisement).

It is undisputed that prior to being hired by DaimlerChrysler Preyer had between nine and ten months of work experience in occupational health nursing. Preyer Dep. at 29 (testifying that he had worked as an occupational health nurse from March 1997, until December 1997). (Def.'s Facts ¶ 65; Pl.'s Resp. to Def.'s Facts ¶ 52.) It further is undisputed that Preyer had four years of clinical experience in clerkships during his degree program, which experience Bush knew included training in intensive care nursing, nursing cardiology, and other fields. Def.'s Facts ¶¶ 67–69.

DaimlerChrysler also asserts that at the time he was hired, Preyer had experience in critical care nursing. Def. Facts ¶ 66. DeWeese disputes this assertion, citing Preyer's testimony that he had never worked in a critical care unit. Preyer Dep. at 30. This distinction seems to arise from Preyer's experience in a "critical care" setting, as a nurse in a postanesthesia care unit, but not technically in a unit

who actually [was] hired." Stanley Dep. at 13.

**12.** A rating of "1" indicated that the candidate had "qualifications that fulfill job requirements;" "2" was meant for "qualifications that are clearly above job requirements and that indicate a stronger candidate;" and "3" indicated "qualifications that are clearly above job requirements and that indicate a preferred candidate." *Id.*

**13.** Bush had noted that Preyer was working on a master's degree in business administration at the time of the interview. In fact, Preyer apparently had not been enrolled in the program for several months prior to the interview, although he told Bush he intended to complete the degree. *See* Preyer App.; Bush Dep. at 58–59.

designated by the hospital as the "critical care unit." *Compare* Preyer Dep. at 29 ("Emergency room experience comes with working in the critical care area as far as the postanesthesia care unit [PACU]."), *and id.* at 30 ("PACU is a critical care unit. It is a critical care unit. You can't take care of critical care patients if they're not in a critical care unit. Which [PACU] is a critical care unit because the critical care patients come in the PACU."), *with id.* at 30 (responding to whether he had worked in a unit specifically designated the "critical care unit," "No, I have not worked in a critical care unit.").

To summarize: Preyer previously worked approximately ten months in occupational health nursing; he had four years of clinical experience during his degree program, including clinical clerkships in intensive care nursing; and seventeen to twenty-one months as a nurse at Community Hospital East, providing treatment to critical care patients, in a setting he considered to be a critical care setting though not in a unit specifically designated by the hospital as the "critical care unit." Bush testified that it was this level of experience by Preyer and Preyer's ability to "sell himself" that led Bush to give Preyer the highest rating for his experience.

Bush also rated Preyer at a level three for his skills and competencies, based again in part on Preyer's ability to sell himself during the interview and his ability to anticipate potential situations which he might encounter as an occupational health nurse (an assessment and rating undisputed by DeWeese). Bush Dep. at 68. In the "Comments" section of the Interviewer's Report, Bush noted that Preyer "[w]ill upgrade medical staff." Def.'s Facts ¶ 73. In addition to Bush's evaluation of Preyer,

he was also interviewed and evaluated by Ken Brune, a Caucasian, male Plant Manager at the Indianapolis Foundry at the time of the employment decision in question, who gave Preyer the highest possible score in each category. Def. Facts ¶ 75–77.[14]

After the interviews, Bush and Gigax reduced the applicant pool to a smaller number of potential hires. *See* Bush Dep. at 37–38. Bush testified that they focused on three applicants, each of whom had obtained a B.S. degree in nursing: Preyer, Carr, and Perry. *Id.;* Def.'s Facts ¶¶ 46–48.[15] Defendant asserts that Bush eliminated Carr after learning that she was intending to go back to school and would be unavailable; Preyer and Perry were the remaining candidates. *See* Bush Dep. at 38–39; Def.'s Facts ¶ 50. Perry, who had received the highest educational and skill/competencies ratings, received only a two for experience because Bush felt she had "limited" occupational health experience. Def.'s Facts ¶ 51; Bush Dep. at 39. Bush's explanation for awarding her a two rather than a three for experience was that "people seldom sell themselves in interviews." Bush Dep. at 77. DeWeese shares DaimlerChrysler's assessment that Perry had limited occupational health nursing experience, equating the nine or ten months she had worked with DaimlerChrysler to those in which Preyer was involved · in occupational health nursing. *Compare* Preyer App. (listing Preyer's occupational health nursing experience as March 1997 to December 1997) *with* Pl. Dep. Ex. 8 ("Perry App.") (showing the same dates for Perry's occupational health nursing experience).

Bush testified that after eliminating Perry from further consideration, he settled

---

**14.** Brune's interview came after Bush had settled on Preyer as his choice and apparently Brune interviewed only Preyer. *E.g.* Pl.'s Additional Facts ¶ 166. Although Brune's approval of Bush's decision was sought because he supervises the nurses, the real decision making authority was in Bush alone. *See* Bush Dep. at 40.

**15.** Defendant asserts that a fourth candidate, Hall, was initially included in this "final" pool; however, Bush did not actually consider her after discovering she would not be available to work all shifts. Bush Dep. at 38.

on Preyer whom he hired as a staff nurse in January 1998. Def. Facts ¶¶ 53; Pl.'s Additional Facts ¶ 156. Bush testified that his hiring decision was based on Preyer's qualifications, education and his ability to sell himself which led Bush to believe Preyer had upward mobility as other opportunities within the company might become available. Def.'s Facts ¶ 58, 70.

DeWeese disputes Defendant's characterization of how Bush came to decide on Preyer for the position, claiming that Bush informed her in a meeting that the final decision came down to a choice between Preyer and herself. DeWeese Dep. at 184. She alleges that Bush told her at this December 1997 meeting that he was hiring Preyer "because he was young enough to move up into the front office." DeWeese Dep. at 184. Bush categorically denies making any such statement stating that "being in human resources for thirty-one years you know what to say and what not to say. I would be absolutely an idiot to make that statement to anybody." Bush Dep. at 48. Bush further testified that the reason DeWeese was not selected was because "we found applicants with a higher [academic] degree than Ms. DeWeese had" and that she "ranked ... [at] the top of [Bush's] list as far as the associate degree candidates." Bush Dep. at 43–44, 46.

DeWeese's associate degree placed her in the lowest education category; it is undisputed that Preyer had achieved a higher level of educational attainment than DeWeese. Def.'s Facts ¶ 57; Pl. Dep. Ex. 5. In addition, Preyer's record of achievements and certificates was identical to that listed by DeWeese on her application and resume. Def.'s Facts ¶ 64. No one disputes that DeWeese had considerable experience, having worked since 1978 first as a Licensed Practical Nurse and thereafter as a Registered Nurse. Bush acknowledged this by assigning her the highest possible rating for her experience. *See* Pl.'s Additional Facts ¶¶ 112–13, 118–28,

134–37. As for skills/competencies, Bush rated her as a two, which, according to his deposition, Bush could not specifically explain in terms of her not receiving a higher rating. Bush Dep. at 73–74.

There is no evidence that Bush ever received "complaints" about DeWeese's skills or computer problems, but both Stanley and Johnson commented to him during the interview process that DeWeese sometimes failed to input all of the necessary information into the computer. Def. Facts ¶ 84–85; Bush Dep. 13–15; Pl.'s Additional Facts ¶¶ 132.[16] Johnson clarified at her deposition that the difficulties she perceived were not specific to DeWeese, but stemmed from the manner in which per diem nurses were used generally, and that she believed they had nothing to do with DeWeese's ability or computer skills. Johnson Dep. at 22–23. Since DeWeese had been working for Defendant for a number of years as a per diem nurse, she had experience with their computers, worked well with the rest of the staff, was well liked by the plant workers, was well aware of the staff nurse's responsibilities, would have required little or no additional training to perform those duties and had never been disciplined. Pl.'s Additional Facts ¶¶ 131, 164–65.

Defendant asserts that neither DeWeese's race (Caucasian) nor her age (50) played a role in Bush's decision to hire Preyer and that the decision not to hire DeWeese was because other candidates (including Preyer) had higher levels of more educational attainment. Def. Facts ¶¶ 80, 101–02; Bush Dep. at 43, 46–47; *see also* Bush Dep. at 44–45 (stating that, in his view, anyone with a B.S. degree and the requisite experience was more desirable that someone with experience and an Associate degree but no B.S. degree). Defendant notes that one of the two then-existing staff nurses was African–American and the other was Caucasian; however, in the thirty-one years that Stanley, a

---

**16.** Bush testified that if he had perceived these comments as complaints, "we probably would not have continued her working." Bush Dep. at 16; Pl.'s Additional Facts ¶ 133.

Caucasian, had been employed as a nurse for Defendant, she testified that she had worked with only two African–American full-time nurses prior to Preyer being hired. Def.'s Facts ¶¶ 2, 4, 7, 8; *see also* Pl.'s Additional Facts ¶ 162 (stating that "Defendant's medical department had historically hired only white nurses."). Over those thirty-one years, the racial composition of the Indianapolis Foundry's production workers had gradually reduced from over ninety percent African–American to approximately two-thirds of the workers by 2000. *Id.* ¶¶ 5–6.

DeWeese counters that age and race did play a role in the hiring decision.[17] As evidence that age played a role, she cites Bush's comment to her during the December, 1997 meeting. *See* DeWeese Dep. at 184. As evidence of the role race played in the decision, DeWeese relies first on her belief that Preyer did not have either the necessary experience or sufficient experience to warrant the highest rating on Bush's evaluation form. In addition, DeWeese cites comments by both of the then-existing staff nurses, Stanley and Johnson. Stanley testified that "when given a choice [Defendant] always hire[s] black first" (although no evidence was cited by Stanley, or DeWeese, for that matter, to support this assertion) and DeWeese testified that Johnson told her (DeWeese) that she (Johnson) had been told by Bush that Bush was looking for an African–American applicant to fill the vacant position. Stanley Dep. at 31; DeWeese Dep. at 194.

Johnson denies ever having heard Bush utter such comments or ever having made such a remark to DeWeese. Def. Facts

¶¶ 102–03. Clearly, DeWeese's testimony containing Johnson's statement is relevant only if offered for the truth of the matter asserted (that Bush said that race mattered); it is therefore hearsay that would be inadmissible at trial. F.R.E. 801, 802.[18] We are not permitted to consider evidence that would be inadmissible at trial when ruling on a motion for summary judgment. *Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 856 (7th Cir.1999); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir.1997); *Collier v. Budd Co.*, 66 F.3d at 886, 892 n. 8 (7th Cir.1995). Therefore, we will not consider Johnson's alleged out-of-court statement in ruling on this motion.

### Discussion

### Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir.1998).

With a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S.

---

**17.** DeWeese also claims that a four-year Bachelor of Science degree was unimportant. It is undisputed that no one on behalf of defendant ever stated that a B.S. or four-year degree was necessary for the position, nor did Bush explain at his meeting with DeWeese that such a degree was even preferable. Pl.'s Additional Facts ¶ 141–42.

**18.** If Johnson herself testified that Bush told her that he was seeking an African–American

applicant, it would not be hearsay as Bush's statement would be an admission by a party-opponent. F.R.E. 801(d)(2)(D). However, Johnson's out-of-court statement is hearsay because it was not made in a representative capacity on behalf of Defendant with respect to hiring decisions and it is inadmissible because no hearsay exception applies. F.R.E. 801, 802.

317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" to cite evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 106 S.Ct. 2548. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in [his] favor on a material question, then the court must enter summary judgment against [him]." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505).

In considering a motion for summary judgment, a court must draw all reasonable inferences in a light most favorable to the non-movant. *Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir. 1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989). However, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but also required. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir.1989).

### *Age Discrimination in Employment Act Claim*

■ The ADEA makes it unlawful to "discharge any individual or otherwise discriminate against any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1); *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) *Michas*

*v. Health Cost Controls,* 209 F.3d 687, 692 (7th Cir.2000). To succeed on a discrimination claim under the ADEA, a plaintiff must show that an adverse employment action would not have occurred "but for" his employer's motive to discriminate on the basis of his age. *Fuka v. Thomson Consumer Elecs.,* 82 F.3d 1397, 1403 (7th Cir.1996); *see also Michas,* 209 F.3d at 692 (describing plaintiff's burden as demonstrating that age was a "determining factor" in an employer's discharge decision).

A plaintiff pursuing an ADEA claim has two means by which to make a prima facie case of discrimination: by presenting direct evidence that age was a determining factor in the employer's decision or by presenting indirect evidence via the burden-shifting method of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) to "demonstrate that the employment decision 'was motivated by the employer's discriminatory animus.'" *Michas,* 209 F.3d at 692 (quoting *Bellaver v. Quanex Corp.,* 200 F.3d 485, 492 (7th Cir.2000)); *Fuka,* 82 F.3d at 1402; *see also Cowan v. Glenbrook Sec. Servs., Inc.,* 123 F.3d 438, 442 (7th Cir.1997) (stating that a plaintiff can establish a prima facie case of discrimination either by presenting direct evidence of a discriminatory motive or by employing the burden-shifting method of *McDonnell Douglas* ). DeWeese contends that the evidence in this case is sufficient to utilize the "direct evidence" proof structure discussed above, while DaimlerChrysler counters that the case should only proceed under the burden-shifting method identified in *McDonnell Douglas.*

■ Direct evidence is " 'evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption.'" *Cowan,* 123 F.3d at 443 (quoting *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir.1997)). Evidence qualifies as "direct" evidence when it "in and of itself suggests that the person or persons

with the power to hire, fire, promote, and demote the plaintiff were animated by an illegal employment criterion." *Venters v. City of Delphi,* 123 F.3d 956, 972 (7th Cir.1997). For a plaintiff to successfully establish direct evidence of discriminatory intent, it "essentially requires an admission by the decisionmaker that his actions were based on the prohibited animus," which admissions are "rarely found." *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 616 (7th Cir.2000).

■■ Such evidence " 'must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question.' " *Cowan,* 123 F.3d at 443 (quoting *Randle v. LaSalle Telecomms., Inc.,* 876 F.2d 563, 569 (7th Cir.1989)). This discriminatory intent may be found in an employer's statement that reveals hostility to older workers or in remarks that reflect a propensity by the decision maker to evaluate employees based on illegal criteria. *Wichmann v. Bd. of Trustees,* 180 F.3d 791, 801 (7th Cir.1999) (per curiam), *vacated on Eleventh Amendment grounds,* 528 U.S. 1111, 120 S.Ct. 929, 145 L.Ed.2d 807 (2000); *Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1044 (7th Cir.1999). Thus, "seemingly stray remarks" can qualify as direct evidence only if they were " 'related to the employment decision in question.' " *Fuka,* 82 F.3d at 1403 (quoting *McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686–87 (7th Cir.1991)). To be probative of discrimination, "isolated comments must be contemporaneous with the [employment decision] or causally related to the ... decision making process." *Geier v. Medtronic, Inc.,* 99 F.3d 238, 242 (7th Cir. 1996). If no connection is established, the remarks are insufficient by themselves to give rise to an inference of discrimination "even when uttered by the ultimate decisionmaker." *Fuka,* 82 F.3d at 1403.

Still, the "stray remark" doctrine is not intended to wholly discount the probative value of comments of a derogatory nature. *See Hunt v. City of Markham,* 219 F.3d 649, 652 (7th Cir.2000). In *Hunt,* the Court distinguished between expressions of discriminatory feelings made by "someone who is not involved in the employment decision of which the plaintiff complains" (which expressions are not evidence of a discriminatory motivation) and discriminatory remarks made by "the decision makers themselves, or those who provide input into the decision ... (1) around the time of, and (2) in reference to, the adverse employment action complained of." *Id.* Faced with the latter, "it may be possible to infer that the decision makers were influenced by those feelings in making their decision." *Id.* Thus, a reasonable jury could find that a single derogatory comment made by the decision maker, expressed contemporaneously with the employment action in question, and in reference to that action is evidence of discrimination and such a comment is sufficient by itself to defeat an employer's motion for summary judgment. *Id.; Wichmann,* 180 F.3d at 801–02; *Sheehan,* 173 F.3d at 1044; *Schaffner v. Hispanic Hous. Dev. Corp.,* 76 F.Supp.2d 881, 883 (N.D.Ill.1999); *Puppel v. Ill. Benedictine Coll.,* 731 F.Supp. 310, 311 (N.D.Ill.1990).

■ Drawing all reasonable inferences in favor of DeWeese, we hold that she has presented us with such a case. DeWeese has testified that Bush (the sole decision maker) told her, in a meeting to explain why she was not being hired (related to the employment decision), held several weeks before the fulltime occupational health nurse position was filled (contemporaneous to the employment decision), that Preyer was being hired "because he was young enough to move up into the front office." Contrary to Defendant's characterization, a reasonable jury could infer from this statement that Bush's decisions on the candidates were based on their ages.

According to DaimlerChrysler, whether Bush actually uttered this remark is "hotly contested." Def.'s Reply Br. in Supp. of Mot. for Summ. J. at 4. However, resolving

this dispute over whether Bush ever made this comment, about which he testified that, if he had made it, he would have to have been a "complete idiot," requires us to weigh the credibility of Bush and DeWeese, a responsibility that clearly rests within the province of a jury. Since the ADEA protects the fifty-year-old DeWeese from discrimination on the basis of her age, Defendant's motion for summary judgment on Count I must be *DENIED.*

### Title VII and Section 1981 Claims

Title VII makes it unlawful for an employer to refuse to hire an individual "because of such individual's race" and Section 1981 prohibits discrimination on grounds of race in the making and enforcing of contracts. 42 U.S.C. § 2000e–2(a)(1); 42 U.S.C. § 1981. The same legal standards and substantive law are applied to both claims. *Vakharia v. Swedish Covenant Hosp.,* 190 F.3d 799, 806 (7th Cir. 1999); *Gonzalez v. Ingersoll Milling Machine Co.,* 133 F.3d 1025, 1035 (7th Cir. 1998). Unlike DeWeese's ADEA claim, both parties have proceeded under the *McDonnell Douglas* burdenshifting proof paradigm in analyzing her race discrimination claims.

■ Although Title VII and Section 1981 have been applied to protect members of historically discriminated-against groups, their protections are not limited to those in such groups. *Mills v. Health Care Serv. Corp.,* 171 F.3d 450, 455 (7th Cir.1999); *see also Hunt,* 219 F.3d at 651. However, the Seventh Circuit has recognized that it is the "unusual employer who discriminates against majority employees" and requires the plaintiff to show "background circumstances" to support the race discrimination claim. *Mills,* 171 at 456–57. Thus, the traditional *McDonnell Douglas* prima facie case is modified in cases alleging "reverse discrimination," requiring the plaintiff to show: (1) background circumstances that give rise to an inference of discrimination; (2) that she applied for and was qualified for an open position; (3) that

she was not hired for the position; and (4) that the employer filled the position with a person in the protected class. *Mills,* 171 F.3d at 457; *but see Iadimarco v. Runyon,* 190 F.3d 151, 160 (3d Cir.1999) (rejecting the need for showing "background circumstances" as being difficult to apply and imposing a "heightened standard" on Caucasian plaintiffs).

If a plaintiff fails to make out a prima facie case, we "need not proceed any further in the *McDonnell Douglas* analysis." *Fisher v. Wayne Dalton Corp.,* 139 F.3d 1137, 1142 (7th Cir.1998) (citing *Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1178 (7th Cir.1997); *Gleason v. Mesirow Fin., Inc.,* 118 F.3d 1134, 1147 (7th Cir.1997)). Absent proof of a prima facie case, plaintiff fails to raise an inference of discriminatory intent and summary judgment must be entered in favor of the defendant. *Fisher,* 139 F.3d at 1142.

On the other hand, if a prima facie case is established, we proceed to the next stage in the analysis. The defendant may refute the inference that it acted with discriminatory intent by providing a legitimate, non-discriminatory reason for its actions. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Pitasi,* 184 F.3d at 716; *Mills,* 171 F.3d at 454. The burden shifts back to the plaintiff to provide enough evidence to show a dispute exists about whether the defendant's given justification is a pretext for discrimination. *Pitasi,* 184 F.3d at 716; *Mills,* 171 F.3d at 454. A plaintiff may prove the defendant's proffered justifications are pretextual either directly, by showing that a discriminatory basis more likely than not motivated the employer, or indirectly be demonstrating that the reasons are unworthy of belief. *Jackson,* 176 F.3d at 983. The latter may be established by showing the explanation: 1) has no basis in fact; 2) did not actually motivate the action; or 3) was insufficient to motivate the action. *Id.; Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir.1996); *Mechnig v. Sears,*

*Roebuck & Co.,* 864 F.2d 1359, 1364–65 (7th Cir.1988) (citations omitted).

A showing by the plaintiff that her employer's reasons for firing her were lies or completely insupportable may sustain the inference that the employer's real motive was improper and may be sufficient to satisfy the plaintiff's burden to prove that discrimination was the true reason for the decision. *See Reeves,* —— U.S. at ——, 120 S.Ct. at 2108; *Jackson,* 176 F.3d at 984 (citations omitted). However, we must evaluate the evidence with the understanding that "[t]he ultimate burden remains with the plaintiff-employee to persuade the trier of fact that the defendant-employer intentionally discriminated against him." *Pitasi,* 184 F.3d at 716 (internal quotations omitted).

Applying these standards to the present case, we find that DeWeese has met her prima facie burden. The parties agree that DaimlerChrysler hired an African–American instead of DeWeese, a Caucasian, for the full-time occupational health nurse position and, despite DaimlerChrysler's arguments to the contrary, Bush testified that DeWeese met the minimum requirements and was qualified for the open position. Bush Dep. at 45 ("We would have accepted an RN with those criteria in the paper if we got nothing else."); *id.* at 46 ("I think I put on the application that [DeWeese] was accepted for hire."); *see also* Pl.'s Additional Facts ¶ 155 (asserting that the Indianapolis Star advertisement contained the minimum qualifications for the position). We move now to the question of whether DeWeese has cited sufficient background circumstances to indicate that Defendant is the "unusual employer" that discriminates against the majority.

In *Mills,* the Seventh Circuit explicated the type of evidence that would satisfy the "background circumstances" standard.

Although the contours of the concept remain imprecise, the Court, after surveying the development of the standard in other circuits, ruled that a plaintiff could satisfy her burden by showing:

'(1) some reason or inclination to discriminate invidiously against whites ... [or] evidence indicating that there is something 'fishy' about the facts of the case at hand;' or (2) 'the person ultimately hired was clearly less qualified than the plaintiff, the hiring authority expressed intense interest in hiring a [member of the minority group], [or] there was a pattern of hiring [a member of the minority group] in the past;' or (3) that 'she was the only white employee in a department and nearly all of the decision makers were [African American].'

*Rayl v. Fort Wayne Community Schs.,* 87 F.Supp.2d 870, 883 (N.D.Ind.2000) (quoting *Mills,* 171 F.3d at 455–57 (citing *Duffy v. Wolle,* 123 F.3d 1026, 1036–37 (8th Cir. 1997); *Reynolds v. Sch. Dist. No. 1,* 69 F.3d 1523, 1534 (10th Cir.1995); *Harding v. Gray,* 9 F.3d 150, 154 (D.C.Cir.1993))).[19]

Applying these standards, the Seventh Circuit held in *Mills* that such background circumstances did exist. The plaintiff, a male, cited that nearly all promotions in the office were given to females and that females dominated the supervisory positions in the relevant office. *Id.* at 457. Although these facts were considered "far from actual evidence of discrimination," the Court held that they were enough to satisfy the plaintiff's prima facie case burden, triggering the employer's burden to articulate legitimate, non-discriminatory reasons for its decision to hire a female instead of the plaintiff. *Id.*

Other courts have read *Mills* to impose an even lesser burden on a plaintiff. In *Rayl,* the Northern District of Indiana held that a Caucasian male satisfied his

---

19. *Mills* described examples of "fishy" circumstances as such "evidence of schemes to fix performance ratings to [the plaintiff's] detriment, that the hiring system seemed rigged against them because it departed from the usual procedures in an 'unprecedented fashion,' or that [a plaintiff was] passed over despite superior qualifications." *Id.* at 455 (citing *Harding,* 9 F.3d at 154).

burden where he showed that the hiring authority had expressed interest in hiring non-Caucasian males, the employer had incentives from the federal government to promote minorities, and only two of fifty-three people in the relevant position were Caucasian males. *Id.* at 883–84. Another district court found the burden satisfied by evidence that a Caucasian plaintiff had been told by his supervisor that while he had previous difficulties with some African–American employees, the store "could not terminate them because they were a protected minority." *Burton v. S.W. Bell Mobile Sys., Inc.*, 74 F.Supp.2d 841, 847 (C.D.Ill.1999). Still another court found such circumstances to exist where a defendant's memorandum failed to show that a female employee had been disciplined for threatening a co-worker when it later fired the male plaintiff for such an action. *Corral v. Chicago Faucet Co.*, No. 98–C–5812, 2000 WL 628981, at *3 (N.D.Ill. Mar.9, 2000). And a fourth court found suspect background circumstances surrounding the termination of a Caucasian employee simply because the decision makers were all African–American and his duties were assumed by an African–American with considerably less experience than the plaintiff. *Perry v. Cmty. Action Servs.*, 82 F.Supp.2d 892, 895 (N.D.Ill.2000).

In contrast, only courts faced with virtually no evidence related to background circumstances have concluded that the plaintiff has failed to meet her burden. In one example, a court held that suspicious background circumstances were lacking when an employer failed to hire a male applicant for a position but 180 of 225 applicants were male and twenty-two of the twenty-seven available positions were filled by men. *Jack v. City of Chicago*, No. 98–C–8087, 2000 WL 705981, at *2 (N.D.Ill. May 22, 2000). Similarly, a male ex-employee failed to identify "fishy" circumstances where his workplace had been male dominated, and there was no evidence that the workplace evaluations were rigged to the male employees' detriment. *Lowell v. Brown*, No. 96–C–562, 2000 WL 521726, at *6 (N.D.Ill. Mar.2, 2000).

■ The facts of the case at bar are close, but understanding as we do that DeWeese's burden at this stage is not onerous, we find that there is evidence to support this element of her prima facie case. It is undisputed that Bush, an African–American, was the only decision maker with the authority to make the hiring decision in question. While it is true that he was the only African–American involved in the decision making process, so far as we have been informed, no one else had any real input into the decision.[20]

Again, allowing all reasonable inferences to flow in favor of DeWeese, it might be reasonable to infer that Preyer's "experience" rating was somewhat inflated (even if there is no evidence to suggest that Preyer was unqualified for the position as DeWeese contends). Although Bush suggests that the experience ratings were subjective and resulted in part from the applicant's ability to "sell himself," it is possible to infer that one reason Preyer was assigned the highest rating for experience level despite his relative lack of experience in the field was due to his race. This inference is supported by comparing Preyer's experience rating with that as-

**20.** Defendant cites *Parker v. Board of School Commissioners*, 729 F.2d 524, 528 (7th Cir. 1984), for the proposition that it would be unreasonable to infer that DeWeese has been subjected to race discrimination because one of her interviewers was African–American. Def.'s Br. at 14. We agree, but its holding is inapposite to the case at bar. *Parker*'s holding relates to the probative value of such facts at the pretext stage of the proof structure, not at the prima facie case stage. *See Parker*, 729 F.2d at 527 (analyzing whether plaintiff has proven pretext). However, DeWeese may rely on facts that are "far from actual evidence of discrimination" in support of her prima facie case, *Mills*, 171 F.3d at 457, and we are not suggesting that Bush's race is enough to show pretext, or for DeWeese to sustain the "ultimate burden," to wit, "to persuade the trier of fact that the defendant-employer intentionally discriminated against [her]." *Pitasi*, 184 F.3d at 716.

signed to Tammy Perry, a Caucasian applicant who also had a B.S. in nursing, but received a mid-level rating for experience as Bush felt she had "limited" occupational health experience, despite the similarities between her training and length of time in the field as Preyer's. *See* Def.'s Facts ¶ 51; Bush Dep. at 39, 77; *compare* Preyer App., *with,* Perry App. None of these facts considered separately are strong enough to indicate "something fishy," but in combining them and drawing reasonable inferences from them in favor of DeWeese, we must conclude that they are enough to satisfy her prima facie burden.[21]

■ This being the case, Defendant's duty is triggered to articulate a legitimate reason for its selection of Preyer to fill the vacancy, which it has done: Defendant states that in addition to Preyer being qualified for the position, it preferred a candidate with a four-year degree (such as Preyer) and his additional post-college schooling would position him to pursue other positions within the company. Having articulated a valid reason to support its decision, the burden shifts back to DeWeese to establish that the reason given by DaimlerChrysler is pretextual.

DeWeese draws on a diverse set of facts in an effort to satisfy this burden. First, she asserts her belief that Preyer did not meet the minimum qualifications for the position in that he lacked sufficient experience. Next, she contends that Bush's testimony to the effect that he preferred a person with a four-year degree is untrue as evidenced by the fact that Johnson was hired as a full-time nurse four years ago with only a two-year Associate degree.

Finally, she cites the fact that Bush told her at the December 1997 meeting that Preyer was being hired because he was young enough to move into other positions in the company.

This evidence, when considered separately and together, is insufficient to satisfy the burden of persuading a reasonable trier of fact that the defendant intentionally discriminated against her on the basis of race. We have previously established that Preyer met the minimum qualifications for the position and will not rehash that discussion here. As for the Defendant's preference for a four-year degree, it is undisputed that Bush assigned to every applicant with a four-year degree the highest possible rating for education and to those with only an Associate degree he gave the lowest possible rating, with the exception of one candidate who had recently received her degree. This is strong evidence that Bush's preference for a four-year degree was honestly held. Although he did hire Johnson as a full-time nurse when she had only a two-year degree, DeWeese has provided no evidence tying this fact to the decision in question. We have not been provided evidence to show whether the "four-year degree" preference was in place at the time of Johnson's hire. DeWeese has cited no evidence indicating whether Bush sought and received an exception in order to hire Johnson. She has not even produced descriptive facts relative to the applicant pool at the time Johnson was hired. Any or all of these factors are necessary before we can conclude that Defendant's asserted reason was untrue.

---

21. While certain of the other facts cited by Defendant may also be relevant (i.e. that the overall racial composition of the workforce at the Foundry had gone from over 90% African–American to approximately two-thirds in the past thirty years and that Preyer was only the third African–American full-time nurse at the Foundry over that time-frame), they do not foreclose the inference established by the evidence discussed above. It is unclear to us whether the applicant pool and racial composition of production workers is even relevant to that of the nurses or other salaried employees. Moreover, while the Foundry had employed only two African–American full-time nurses in the thirty-one years prior to its hiring of Preyer, it is possible to infer from the evidence that in the time that Bush has been responsible for hiring full-time nurses (at least prior to the filing of this lawsuit) he had hired only African–Americans: first Vicki Barlow, then Patricia Johnson, and finally Antonio Preyer.

This leaves only the alleged statement to DeWeese that Bush was hiring Preyer due to his age. Although this may be considered evidence that Bush considered Preyer's age in making his decision (such consideration being discriminatory under the ADEA), a reasonable jury would not also conclude that it shows Defendant considered her race. Pretext means "a lie, . . . a phony reason for some action." *Russell v. Acme–Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). The mere fact that Bush considered Preyer's age does not mean that Defendant's asserted reason for hiring him— that he had a four-year degree and plaintiff did not—was false, a lie or completely insupportable.

Defendant has provided ample undisputed evidence that Bush was genuinely interested in finding an applicant with a four-year degree for the position, not only through Bush's testimony but also through the process he used to find a replacement for Overpeck. As recounted above, one of the three areas rated by Defendant during their interviews for the position was the applicant's education, and Bush assigned to each of the people with a four-year degree the highest rating while to those applicants without this degree, such as Plaintiff, he assigned the lowest rating. DeWeese has not provided any admissible evidence disputing that such ratings were legitimate and actually considered in the decision process. Moreover, at Daimler-Chrysler's direction, Bush maintained a chart identifying the educational level of each and every employee at the Indianapolis Foundry. Clearly, the level of education attained by its employees mattered to Defendant.

The Supreme Court's opinion in *Reeves*, while relevant, does not compel a contrary outcome in our case. In *Reeves*, the Court held that some plaintiffs could satisfy their overall burden by making out a prima facie case and proving that the asserted justification of the defendant was false. *Reeves*, —— U.S. at ——, 120 S.Ct. at 2109. However, as we note above, DeWeese has not provided this level of proof. Even if we conclude that *Reeves* were applicable here, the Court held that if the plaintiff creates "only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," judgment should enter in favor of defendant. *Id.* Liability depends on a number of factors, the Court explained, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for [summary] judgment." *Id.* DeWeese's prima facie case is weak, her evidence that the explanation is false does not completely refute the Defendant's explanation, and the employer's explanation is independently verified through the additional evidence discussed above. Thus, we find that DeWeese has not provided evidence that Defendant discriminated against her on the basis of her race and *GRANT* Defendant's motion for summary judgment with respect to Counts II and III.

*Conclusion*

For the foregoing reasons, summary judgment with respect to Count I, alleging age discrimination under the ADEA, is *DENIED*, and summary judgment with respect to Counts II and III, alleging race discrimination under Title VII and Section 1981, is *GRANTED*.